(Nos. 13870-71-72.—Reversed and remanded.)
SAMUEL P. SMURR, Plaintiff in Error, *vs.* JOHN F. KAMEN
*et al.* Defendants in Error.

*Opinion filed December 22, 1921—Rehearing denied Feb. 8, 1922.*

1. EQUITY—*equity looks through form to substance of transaction.* Equity looks to the substance of a transaction and not to its form, and will not permit the rights of parties to be sacrificed to the mere letter but will look to the spirit of the transaction to discover the truth.

2. SPECIFIC PERFORMANCE—*when equity will decree specific performance of a contract for sale of corporate stock.* The right to specific performance of a contract for the sale of corporate stock depends upon the character of the stock, and if the shares are readily obtainable in the open market specific performance will not be decreed, but if the shares have no market rating and cannot easily be obtained elsewhere specific performance will be granted.

3. SAME—*when assignees of the defendant may be compelled to perform his contract to transfer corporate stock.* In a suit to compel specific performance of a written contract to transfer to the complainant certain shares of stock, members of the defendant's family, who without consideration and with knowledge of, or chargeable with knowledge of, the contract, accept from the defendant an assignment of shares of stock covered by the contract, may be compelled, with the defendant, to carry out the contract.

4. SAME—*what does not amount to surrender of rights under contract.* Where the president of a corporation has a written contract by which the principal stockholder has agreed to cause a certain number of shares of stock held by him to be transferred to the president, the fact that the president, after a verbal repudiation of the contract by the other party, attends an annual meeting and participates, without formal protest, in declaring dividends, does not amount to a surrender by him of his right to the stock or the dividends thereon, as against the other party and his wife and children, who without consideration and with knowledge of the contract became assignees of a portion of such stock.

5. SAME—*acceptance of bonus voted by stockholders is not a waiver of contract rights.* The fact that the president of a corporation accepts a bonus voted by the stockholders for his services does not amount to a waiver of his rights under a written contract with the principal stockholder for a transfer of certain shares of stock held by such stockholder.

6. SAME—*want of mutuality is not necessarily a defense.* Want of mutuality in a contract is not necessarily a defense to specific performance and cannot be urged as against a complainant who has fully carried out his part of the contract upon which the claim of lack of mutuality rests.

CARTER, J., dissenting.

WRIT OF ERROR to the First Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding.

ORVILLE W. LEE, and M. MARSO, for plaintiff in error.

BECKMAN, OLSON & PHILLIPS, (ALBERT O. OLSON, of counsel,) for defendants in error John F. Kamen and the Smurr & Kamen Company.

ELLIS S. CHESBROUGH, for other defendants in error.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

In 1903 Samuel P. Smurr, plaintiff in error, and John F. Kamen, one of the defendants in error, engaged as partners in the manufacture of machinery. The partnership continued until 1907, when a corporation was organized under the name of Smurr & Kamen Machine Company, with a capital stock of $50,000, divided into 500 shares. One hundred and forty shares were issued to Smurr, 140 shares to Kamen and one share to E. T. McKaig. McKaig's share was subsequently transferred to Bessie Spencer. In the spring of 1915 the company was on the verge of bankruptcy and it was necessary to re-organize. The name was changed to Smurr & Kamen Company and the capital stock was reduced to $12,500. Of the 125 shares, 10 shares were issued to Smurr, 10 shares to Kamen and 1 share to Bessie Spencer. The remaining 104 shares were unissued. In order to raise money to keep the business going Kamen sold

18 shares to five of his relatives. The company owed Kamen $6300 for moneys advanced by him from time to time. May 1, 1915, at a meeting of the board of directors, which consisted of Smurr, Kamen and Spencer, it was ordered that stock of the company be issued at par in payment of moneys advanced to the company. Pursuant thereto there were issued 63 shares to John F. Kamen, 8 shares to Clara Peters, 5 shares to Mrs. Fred W. Peters, 2 shares to Clarice Peters, 2 shares to Joseph J. Kamen and 1 share to Bessie Spencer. The annual meeting was held July 26, 1915, and thereafter new certificates bearing the company's new name were issued to all stockholders, replacing the temporary certificates theretofore issued. Smurr was re-elected president and Kamen was re-elected secretary and treasurer. Early in the spring of 1915, when Smurr and Kamen realized that their business was rapidly approaching a state of insolvency, they agreed upon a plan of re-organization which would enable them to raise money to carry the business over the dull period and at the same time enable them to continue as full owners of the business in equal shares. Shortly after the annual meeting Smurr caused this agreement to be reduced to writing by Albert O. Olson, counsel for the company and solicitor in the case at bar for defendants in error John F. Kamen and the Smurr & Kamen Company, by which Kamen, in effect, agreed to secure for Smurr one-half of the 82 shares issued to Kamen and his relatives. Because of extraordinary profits made from war contracts the company prospered quite beyond the expectations of Smurr or Kamen, and Kamen repudiated the agreement and now claims that Smurr has no interest in the 82 shares in question. July 26, 1916, an annual meeting was held and dividends amounting to $600 a share were declared and subsequently paid. February 17, 1917, Smurr was ousted as president and Kamen elected president and treasurer and Spencer was elected secretary. March 16, following, Smurr filed his bill in the circuit court of Cook

county against the corporation and all the stockholders, praying that a voluntary transfer of 54 shares of the 63 shares of stock theretofore issued to Kamen, but which he subsequently transferred without consideration to his wife and two minor sons, be decreed to be fraudulent and void, and that Kamen be ordered and decreed to surrender to the corporation the 63 shares of stock or that he be ordered to re-issue said stock in equal parts to himself and Smurr; and further, that an account be taken of the dividends paid on said 63 shares of stock, and that Kamen be ordered to pay the amount received by him, less any amount due him under the terms of the Smurr-Kamen contract, into the treasury of the company, or that Kamen be directed to pay one-half of the amount of said excess to Smurr; and further, that Kamen be ordered to re-purchase for and on behalf of the corporation the 17 shares of stock issued to defendants in error Joseph J. Kamen, Clara Peters, Mary Peters and Clarice Peters, and that in the event of his inability or failure so to do the value of said stock be ascertained and Kamen be ordered to pay the same into the treasury of the corporation, together with dividends theretofore paid thereon, and for such other and further relief as equity may require. Minnie F. Kamen, wife of John F. Kamen, was appointed guardian *ad litem* of their minor sons, Willard B. Kamen and Clifford Kamen. Demurrers were filed by all the defendants. The chancellor sustained the demurrer in so far as the bill sought specific performance of the contract against Joseph J. Kamen, Mary Peters, Clara Peters and Clarice Peters, the owners of the 17 shares of stock in dispute, and overruled the demurrers filed by the other defendants. All other defendants answered, denying Smurr's right to specific performance of the Smurr-Kamen contract on the ground that it was illegal and void, and on the further ground that the contract had been abandoned by Smurr and that he had accepted certain moneys in satisfaction of his claims thereunder. The cause was

referred to the master, who took proof and reported that Smurr was entitled to recover from Kamen one-half the value of the 82 shares of stock in dispute as of July 26, 1916, together with one-half the dividends paid on said stock. Objections were heard and overruled and the report was filed. The chancellor heard and overruled exceptions to the report and entered a decree directing that Smurr have and recover from Kamen the sum of $64,972, with costs. No decree was entered against the other defendants. The defendants to the bill prayed an appeal jointly and severally. Appeals were perfected by the Smurr & Kamen Company and by Minnie F. Kamen, individually and as guardian *ad litem.* John F. Kamen sued a writ of error out of the Appellate Court for the First District. Joseph J. Kamen, Mary Peters, Clara Peters and Clarice Peters also sued out a writ of error on the ground that their interests as stockholders were adversely affected by the decree. The several cases were consolidated for hearing in the Appellate Court and separate judgments were entered in each case reversing the decree and remanding the cause, with directions to dismiss the bill for want of equity. The several causes have been brought to this court by *certiorari* and are here consolidated for hearing.

In so far as the corporation, the Smurr & Kamen Company, is concerned, the 82 shares of stock in dispute were sold to the several persons to whom the certificates were issued and the sale was unconditional. This is shown by the records of the corporation, and there is no evidence in the record before us showing any agreement or understanding to the contrary. The four stockholders who owned the 17 shares of stock for which relief is asked by the bill were not parties to the agreement between Smurr and Kamen and so far as this record shows had no knowledge of the understanding between them, and so the demurrer was properly sustained in so far as the bill sought specific performance by them. The bill asks no relief with respect to the

two shares held by Bessie Spencer, and they will therefore not be further considered. The issue arising on this record is therefore narrowed to the rights of Smurr and Kamen under the written agreement entered into by them shortly after the annual meeting in 1915. This agreement reads as follows:

"This agreement, made this 26th day of July, A. D. 1915, between John F. Kamen, party of the first part, and Samuel P. Smurr, party of the second part, witnesseth:

"Whereas the parties to this agreement have been for many years jointly interested in the conduct and operation of a machine shop business in Chicago, Cook county, Illinois; and whereas each of the parties has heretofore owned and represented a one-half interest in said business; and whereas it has become necessary to borrow money for the conduct of said business and to issue stock to various other persons, and also to issue a certificate for 63 shares of stock to John F. Kamen because of money loaned to the company by him; and further, whereas said Smurr has continued to devote his skill, energy and industry to the said enterprise or business heretofore conducted as the Smurr & Kamen Machine Company and now conducted as the Smurr & Kamen Company; and further, whereas said skilled services of said Smurr have contributed to the success of the company and it is desirous on the part of Kamen that said Smurr shall continue to devote his time and energy to the success of said business:

"Now, therefore, the following agreements are hereby entered into:

"1st. It is agreed that for the present certificates of stock shall be issued to all the parties who have advanced money to the company on the basis of the par value of said stock, $100 per share.

"2d. It is further agreed that as soon as the company is able so to do, that it shall re-purchase from the parties obtaining stock for money advanced to the company such stock so issued at the price of $200 per share, and that in addition thereto the company shall pay to John F. Kamen for his services in financing the company when it was necessary to have financial aid, the sum of $1400, said payments, however, to be in lieu of and in full of all dividends earned by the company during the year 1915.

"In consideration of said payments and emoluments made, the said John F. Kamen agrees with Smurr that he will obtain all stock outstanding except the 20 shares owned by the parties hereto, and will either turn them in to the treasury of the company as company assets or agree that same be re-issued in equal parts to the parties hereto, the purpose of said agreement being to encour-

age the said Smurr to devote his skill and energy and to maintain his interest in said business, and to further said purposes that as far as may be legal and possible said parties shall be equal in power and control and interest in said business as soon as the payments above specified have been made.

"Witness our hands and seals this 26th day of July, 1915.

JOHN F. KAMEN,   (Seal)

SAMUEL P. SMURR.  (Seal)"

Prior to the time that this agreement was made the company had never paid a dividend. Smurr and Kamen had been in the business of manufacturing machines, principally screw machines and turret lathes, for twelve years. During all this time they had held equal interest and authority in the business. When the company was re-organized and this agreement was made the prospects for the year promised a reasonable return on the money invested but did not promise unusual or extraordinary profits. Shortly after the agreement in question was signed, Smurr, as president of the company, secured a contract for the manufacture of a large number of screw machines. This order alone aggregated $100,000. From time to time during the winter of 1915-16 Smurr and Kamen talked about the agreement in question, but Kamen took no steps to buy the 17 shares that had theretofore been issued to his relatives, nor did he pay himself the amount due him under the contract and re-issue the 63 shares of stock to himself and Smurr in equal shares. Matters remained in this unsettled state until the date of the annual meeting, July 26, 1916. During the morning of that day Smurr and Kamen had a further conversation regarding their agreement. Kamen testifies that Smurr said to him, "Jack, what are we going to do?" and that he replied, "We are going to have a meeting and declare a dividend;" that Smurr asked, "What are you going to declare?" and that he replied, "About $600 per share;" that Smurr then said, "How about our engagement?" and that he replied, "Smurr, I don't think that agreement is worth a continental; I have had an attorney look that up." Smurr's

version of the conversation is as follows: "I asked him if he had made arrangements with the other stockholders to sell the stock back to the company. He replied, 'I have talked with them and they wont stand for it; they want what is coming to them, but they are willing for us to divide the $30,000 made from the outside work. Smurr, I have talked with a lawyer about this matter and he has advised me that it would be criminal to put over a deal like that.' He said he had taken his copy of the contract home and his wife had found it and said that it would not be right to go through with it; that he had taken their money and they should have the profits, no matter what they were. Then I said, 'Kamen, how about the agreement? Didn't you know what you were signing? Where do I get off? I want to live up to the agreement. If what you say is true I get the short end of it. I am greatly disappointed at your attitude.'" Propositions were made back and forth but no agreement was reached. The annual meeting was held at Kamen's home and Kamen and his relatives ran it to suit themselves. Smurr was present, presided at the meeting, and, so far as the record shows, entered no protest. Subsequent to this meeting Smurr and Kamen had a number of conversations regarding the fulfillment of the agreement. The breach in their relations continued to grow more serious until the final break came in February, 1917.

The agreement between Smurr and Kamen was prepared by the attorney regularly employed to do the business of the corporation and his fee for the work was paid from corporate funds. Kamen does not deny the execution of the agreement but seeks to escape responsibility under it by claiming that the agreement is void and therefore incapable of enforcement. Equity looks through forms to the substance of a transaction, and will not permit the rights of parties to be sacrificed to the mere letter but will look to the spirit of the transaction to discover the truth. (*Knights* v. *Knights,* 300 Ill. 618.) This record clearly

shows that as between Smurr and Kamen the $8000 paid into the company's treasury for the 63 shares issued to Kamen and the 17 shares issued to Kamen's relatives was regarded as a loan and the stock was issued to Kamen and his relatives to be held in trust by them for the benefit of Kamen and Smurr, and that Kamen agreed to transfer to Smurr one-half of this stock as soon as he was able to pay, from dividends received on the stock, amounts equal to $200 a share and an additional sum of $1400 to himself. By this agreement Kamen was to receive $14,000 for the $6300 he put into the company and Kamen's relatives were to receive $3400 for the $1700 they put into the company. As between Kamen and Smurr, it was never understood that the 63 shares of stock were issued to Kamen in payment of the amount he had advanced the company. If the company had done a normal business and had made normal profits this lawsuit, in all probability, would never have occurred. The bill alleges that "on July 26, 1915, there was owing by said company to said John F. Kamen for and on account of loans and advances $6300, and that to secure the re-payment thereof there had been issued to him a certificate for 63 shares of the capital stock of said corporation." By their answers defendants in error admit "that on July 26, 1915, there was owing by said company to said John F. Kamen for and on account of loans and advances the sum of $6300, but defendants in error deny that the certificate for 63 shares issued to said John F. Kamen was as security and aver that it was in actual payment of the obligations of the company to him." There is no pretense that Kamen advanced any money to the company after the directors' meeting on May 1, 1915. The stock was issued to him at that time, and if it was issued in payment of the $6300, then the company did not owe Kamen $6300 July 26, 1915. As between the corporation and all others concerned the corporation paid its debt to Kamen May 1, 1915, but as between Smurr and Kamen the

63 shares issued to Kamen were held by him as security
for the re-payment to him of the $6300 with a bonus of
$7700, with the understanding that Kamen was to trans-
fer one-half of this stock to Smurr after Kamen was paid
what was due him.   Kamen also agreed to re-purchase the
17 shares of stock held by his relatives and to deliver one-
half of them to Smurr.   Kamen had sold these shares to his
relatives and ought to have known whether he could carry
out this part of the agreement at the time he signed it.   It
follows, therefore, that Smurr is entitled to a decree com-
pelling Kamen to transfer to him 40 shares of the capital
stock of the Smurr & Kamen Company.

Holding, as we do, that the corporation and the other
stockholders are not interested in this collateral agreement
between Smurr and Kamen, we see nothing to prevent a
decree directing the specific performance of the contract.
The right to specific performance of a contract for the sale
of corporate stock depends upon the character of the stock.
If the shares are readily obtainable in the open market spe-
cific performance will not be decreed, but if the shares have
no market rating and cannot easily be obtained elsewhere
specific performance will be granted.   (*Hills* v. *McMunn*,
232 Ill. 488;   5 Pomeroy's Eq. Rem.—2d ed.—sec. 2174;
6 Fletcher on Corp. sec. 3899.)   The record in this case
shows that the stock of the Smurr & Kamen Company was
not listed on the market and that it had no market value
and that it could not be obtained except from stockholders
who are parties to this suit.   Kamen now holds 19 shares
of the stock in his own name and his wife and two minor
sons each hold 18 shares of the stock.   His wife, Minnie
F. Kamen, accepted the 18 shares in her name with full
knowledge of the agreement between Kamen and Smurr,
and neither she nor either of Kamen's minor sons paid any-
thing for the stock transferred to them by Kamen.   There
is therefore no difficulty in the enforcement of the contract
against these defendants, who had notice or knowledge of

the agreement at the time of the alienation of the stock or who were objects of Kamen's bounty and not *bona fide* purchasers for value. They have no equity against Smurr, who has in good faith contracted with Kamen and given value upon the faith of his contract. Kamen's wife and sons are liable to the same equity as Kamen and stand in his place and are bound by what he is bound in equity to do. They took the stock impressed with a trust in favor of Smurr and hold as trustees for him, and can be compelled to specifically perform the agreement by transferring the stock to Smurr in the same manner and to the same extent as Kamen must have done had he not transferred to them the legal title.

It is contended by defendants in error that Smurr has surrendered whatever rights he may have had under the agreement in question by participating in the 1916 annual meeting and by accepting a bonus of $15,000 which the stockholders voted to Smurr and Kamen for their services as officers and active managers of the corporation. This contention cannot be sustained in so far as it applies to Smurr's right to have specific performance of his agreement with Kamen to transfer to him 40 shares of the stock of the corporation. It clearly appears from the record that it would have done Smurr no good to refuse to attend the meeting or to protest against the action taken at the meeting. His signing of the new certificates as president of the corporation is not sufficient to show an abandonment of the contract. He had known Kamen for twenty-five years and had been intimately associated with him in business for many years, and he had a right to assume that he might appeal to Kamen's sense of fair dealing and get him to carry out the terms of their agreement. In any event, Kamen cannot with good grace urge that Smurr could not trust him to this extent. For the same reason we hold that he did not lose his right to one-half of the dividends declared and paid on the 63 shares of stock held by Kamen.

As we have said, Kamen was holding these shares in trust for the equal benefit of himself and Smurr, and Smurr is entitled to one-half of the earnings of the stock while so held. We must hold, however, that Smurr's acquiescence in the payment of the dividends to the holders of the other 19 shares of stock makes it inequitable to order Kamen to pay to Smurr any part of the dividends paid to the five shareholders other than Smurr and Kamen. Smurr knew at the time that these shareholders were not parties to the agreement and that they were under no obligation to return the money to the treasury of the company or to pay any part of it to him. He stood by and permitted this dividend to be declared and the funds to be paid out of the treasury of the company and is bound by his conduct in that regard. The stockholders had a right to vote Smurr and Kamen $15,000 each as a bonus for their successful management of the business, and Smurr's acceptance of this bonus was in no way a settlement of his claim against Kamen.

It is also contended that specific performance cannot be decreed because the contract lacks mutuality. Want of mutuality is not necessarily a defense to the specific performance of a contract, (*Armstrong Paint and Varnish Works* v. *Continental Can Co.* (*ante*, p. 102,) and it is certainly no defense in view of the facts in this case, because Smurr has fully performed his part of the contract. (*Oswald* v. *Nehls*, 233 Ill. 438.) The contract in question clearly implies an agreement on the part of Smurr to serve the corporation as its president and to devote his skill and energy to the conduct of the business of the corporation, and the fact that he has served the company faithfully and has brought into the business his skill and energy and has provided the company with valuable contracts from which the extraordinary profits were made, supplies mutuality to the contract if it did not exist before.

The judgments of the Appellate Court and the decree of the circuit court are reversed and the cause is remanded

to the circuit court of Cook county, with directions to enter a decree in accordance with the views herein expressed.

*Reversed and remanded, with directions.*

Mr. JUSTICE CARTER, dissenting.