## The United Electric Coal Companies, Appellee, v. Keefer Coal Company of Illinois et al., Appellants.

### Gen. No. 8,422.

Opinion

filed January 26, 1931. Rehearing denied April 10, 1931.

SIMS, GODMAN & STRANSKY and REARICK & MEEKS, for appellants; FRANKLIN J. STRANSKY and GEORGE F. REARICK, of counsel.

ACTON, ACTON, & SNYDER, for appellee; W. M. ACTON, of counsel.

MR. JUSTICE NIEHAUS delivered the opinion of the court.

This appeal from a decree of the circuit court of Vermilion county was transferred to this court by the Supreme Court. *United Electric Coal Cos. v. Keefer Coal Co.,* 338 Ill. 288.

The opinion of the court transferring the cause summarized the facts as follows:

"The United Electric Coal Companies filed a bill in the circuit court of Vermilion county on July 29, 1927, against the Keefer Coal Company of Illinois, the object of which was to obtain an injunction against the declaration of a forfeiture of a certain lease of lands in Fulton county, Illinois, for the purpose of mining and removing the coal in and underlying such lands until the arbitrators to whom had been submitted a question in dispute as to the quantity of merchantable coal within the terms and meaning of the lease had rendered their finding in the premises and until the Court should otherwise order, and for further equitable relief. Upon the filing of the bill a temporary injunction was granted in accordance with the prayer of the bill. The bill was answered, a cross-bill was filed by the New York Trust Company, the trustee in a mortgage on the property, two of the three arbitrators made an award, supplemental bills were filed and answered, the cause was heard, and on April 27, 1929, a decree was entered which construed the lease, set aside the award, ascertained the whole amount of rental to become due from the lessor to the lessee under the lease and the amount which had accrued on the date of the decree, being $143,016.95, and the complainant having brought that sum into court and made payment of it to the Keefer Coal Company of Illinois, the injunction bonds of $175,000 required by the previous decrees of the court were ordered released and all liability under them discharged because of the payment to the Keefer Coal Company of Illinois, the acceptance of the money to be without prejudice to any of the claims

of the Keefer Coal Company or its right to question, on appeal, any provision of the decree except as to any liability on the injunction bonds. It was further decreed that the Keefer Coal Company of Illinois be enjoined from declaring any forfeiture of the lease so long as the United Electric Coal Companies made payment to the Keefer Coal Company of the payments under the lease as they may hereafter accrue, at the times and in the amounts determined by the decree.''

''This litigation grew out of a mining lease of 1320 acres of land in Fulton county, Illinois, by William W. Keefer, the owner, to the Electric Coal Company, dated May 1, 1923, but actually executed a few days later, whereby the lessor leased the premises to the lessee for the purpose of mining and removing the coal for a period of fifteen years and eight months, beginning May 1, 1923, and ending December 31, 1938. The lessee agreed to pay as rent the aggregate principal sum of $2,000,000, to be increased or diminished, however, in the manner provided in the lease, if there is an overplus or a deficiency of merchantable coal in the premises as the lease provides. The rent was agreed to be paid in installments of $25,000 on or before January 1, 1924, for the remaining eight months of ·1923, $75,000 on or before January 1, 1925, for 1924, and $135,714.38 each succeeding year, payable in quarterly installments of $33,928.57, beginning April 1, 1925. The rent of $2,000,000 was predicated upon 1000 acres of merchantable coal, surface measurement, underlying the premises leased, and it was agreed that upon uncovering the coal a complete survey of the leased premises would be made by engineers of the parties to determine the quantity of merchantable coal in the premises, and if the survey showed more than 1000 acres of merchantable coal, surface measurement, in the premises, the lessor should be paid by the lessee additional rent therefor at the rate of $2,000 an acre,

and if the survey showed a deficiency of merchantable coal a deduction would be made from the rent reserved of $2,000 an acre. Should any question arise between the parties as to the quantity of merchantable coal, provision was made for submitting the question to arbitration.

"The contract is signed by Keefer and the Electric Coal Company. Attached to it is a guaranty executed by the United Electric Coal Companies reciting that it owns all the capital stock, except qualifying shares, of the Electric Coal Company and controls its business in operation and agrees that the Electric Coal Company will make all payments specified in the lease and perform all its covenants. Attached to the bill as an exhibit is an agreement between Keefer and the Keefer Coal Company of the first part and the United Electric Coal Companies of the second part, reciting the lease of May 1, 1923, its assignment by the Electric Coal Company, the guaranty by the United Electric Coal Companies and the assignment by Keefer of all his rights in the premises to the Keefer Coal Company, and stipulating that the party of the first part sells to the party of the second part the premises described, with the agreement that when the money specified in the lease shall have been paid, the party of the first part will convey and assure to the complainant by warranty deed, free of incumbrance, the fee simple title to the land, furnishing abstracts showing merchantable title and agreeing to cure any defects. The United Electric Coal Companies went into possession of the land and began and continued to mine coal by the stripping method. The engineers for the respective parties made a joint survey of the land and were unable to agree upon the number of acres underlaid with merchantable coal, the appellee's engineer finding that there were 874.42 acres and the appellant's that there were 911.54 acres. On October 28, 1926, the United Electric Coal Companies notified the Keefer

Coal Company that a dispute existed as to the amount of merchantable, practically recoverable coal in the premises and as to the amount of the thirteen annual payments beginning in January, 1926, and thereafter requested that the questions be submitted to arbitration and named Walter C. Lindley as arbitrator. The Keefer Coal Company named James N. Jarvis as arbitrator, and these two selected John C. Slade as the third member, as provided by the lease. The arbitrators proceeded to a hearing, and an award was rendered by Jarvis and Slade, in which Lindley did not join, fixing the number of acres at 887.37.''

Under the assignments of error in this case, several questions are presented for review which arise from the averments of the original bill and the supplemental bill that were filed in due course of the controversy. The appellee avers in the original bill that by legal construction of the terms and provisions of the lease contract in question, the term ''merchantable coal'' therein used should be held to mean only ''such coal which is recoverable by the stripping process of mining.'' The original bill was filed after the disputed questions which had arisen between the parties had been submitted to arbitration under the provision in the lease contract in relation thereto, and before the arbitrators had made their award. And after the award by the arbitrators had been made the first supplemental bill was filed, which raises the question of the validity of the award of the arbitrators; also brings into the controversy new contentions, namely, that there was a mutual mistake made in the drafting of the contract; and that the contract does not express the real intention of the parties thereto, concerning the amount of ''merchantable coal'' to be paid for by the appellee; and that the term ''merchantable coal'' according to the terms of the lease contract and according to the real intention of the parties, should be construed to mean, ''the coal practically recoverable by

the so called stripping process of mining''; and that the contract should therefore be reformed by adding to the words ''Merchantable Coal'' wherever they occur in the contract, ''strippable and.'' A determination of the disputed questions in the controversy also necessitate a determination of the dominant question in dispute, namely, how much rent is due and to become due and payable to appellant under the terms of the lease contract.

There is no evidence in the record from which the inference could be reasonably drawn that a mutual mistake was made by the parties in the wording of the contract; nor is there any evidence to show mutual intention of the parties to contract differently from written terms and conditions of the contract in question; on the contrary, the evidence is clearly to the effect that the contract was made by parties of unusual intelligence, who dealt at arm's length; and was the result of much negotiation and correspondence and repeated and detailed considerations of the subject matter and the terms and provisions of the contract. And the inference to be drawn from the evidence leads to the conclusion that both parties were thoroughly familiar with the subject matter and the effect of terms and conditions of the contract; and that they were fully conversant with the words and language used in expressing its terms and provisions. We are of opinion, therefore, that the construction to be given the contract concerning the disputed questions raised in this litigation should be based on the written instrument itself as it was made by the parties. *Sterling-Midland Coal Co. v. Great Lakes Coal & Coke Co.,* 334 Ill. 281; *Chicago Auditorium Ass'n v. Fine Arts Bldg.,* 244 Ill. 532; *Rector v. Hartford Deposit Co.,* 190 Ill. 380; *Tayloe v. Riggs,* 1 Pet. (U. S.) 590; *Van Ness v. City of Washington,* 4 Pet. (U. S.) 232; *Hoefeld v. Ozello,* 290 Ill. 147.

It may also be pointed out that there is no ambiguity in the contract; and that the terms and provisions thereof concerning the matter in dispute are clear and conclusive.

While the contract recites that the lessee desires to acquire certain tracts of land owned by the lessor which are underlain with coal, "for the purpose of mining the coal therefrom by the so called stripping or other method," it is apparent from the consideration of the contract in that regard that both parties assumed and expected that the stripping method of mining coal would be the only method employed. This is especially made clear by the provisions of paragraph 9 of the contract, which provides: "The lessee shall work and mine said leased coal premises in the most effectual, workmanlike and proper manner, according to the most approved and suitable methods and practices of modern strip mining, and in such manner as ultimately to recover the greatest amount of merchantable coal practically recoverable from said leased premises that are operated during the term of this lease."

And it is also clear that this method of mining has no bearing upon the question of ascertaining the amount of rent which the lessee is required to pay for the premises leased. In reference to this disputed question the contract provides that "the lessee will pay as rent to the lessor an aggregate principal amount of $2,000,000; which amount however, may be increased or diminished as provided in section 2 of the contract; if there is an overplus or deficit of merchantable coal in the leased premises," as provided in that section. And the provisions of section 2 concerning this matter are as follows: "The said sum of Two Million and no/100 ($2,000,000) Dollars is predicated upon there being one thousand (1000) acres, surface measurement, of merchantable coal in and underlying

the premises herein leased"; . . . and if "there are more than One Thousand (1000) acres of merchantable coal, surface measurement, in the said premises, the lessor shall be paid by the lessee additional rent therefor at the rate of Two Thousand and no/100 ($2,000) Dollars per acre, and if such results disclose a deficiency of merchantable coal, a deduction from the amount of the total rent herein reserved will be made at the rate of Two Thousand and no/100 ($2,000) Dollars per acre. The annual payments due January 1, 1926, and thereafter, as hereinbefore provided, shall be ratably increased or diminished to take care of such overplus or deficiency in the quantity of coal herein leased when such quantity shall have been determined." . . . "Should any question arise between the lessor and the lessee as to the quantity of merchantable coal in said leased premises, either the lessor or the lessee may submit such question to arbitration in the manner hereinafter set out in Section Fifth hereof."

It is apparent, from the terms and provisions of the contract referred to, that any reduction or increase in the amount of rent to be paid by the lessee under the contract is made to depend entirely on the amount of merchantable coal in the premises leased; and that the amount of merchantable coal is to be ascertained by a survey, and surface measurement of such coal. No other way of ascertaining the amount of merchantable coal is provided for in the lease; the amount of merchantable coal in the premises is to be ascertained by surface measurement of the coal and not by an inquiry or investigation of the amount of merchantable coal "recoverable by the stripping method of mining."

It is also evident, from what has been said, that a reformation of the contract as prayed for by appellee in the first supplemental bill would have the effect of making a new contract for the parties; and a con-

tract which would be materially different from the one which they made for themselves.

Concerning validity of award of the arbitrators the record discloses that the submission to arbitration was made under the provisions of the contract in that regard, to settle matters in dispute, and which are substantially the same as are involved in this litigation. This is made clear by the averments of the original bill filed by the appellee to enjoin a forfeiture of its contract, which are to the effect arbitrament was made to ascertain "the quantity of merchantable coal within the terms and meaning of said lease," and thereby to determine the amount of the thirteen annual payments of rent beginning January, 1926, and thereafter. The averments of the bill in that regard are as follows: "That the complainant and Keefer Coal Company of Illinois, 'were unable to agree through their respective engineers as to the quantity of merchantable and recoverable coal in the premises described in the aforesaid lease.' And complainant avers, that instead of there being a 1000 acres of merchantable coal within the meaning of said term as used in said contract, there was in fact not to exceed in any event 600 acres of such coal, and that in pursuance of the provision of said lease that should any question arise as to the quantity of merchantable coal, that either party might submit such question to arbitrators, complainant did so request several months ago and in pursuance thereof, complainant selected Walter C. Lindley as an arbitrator, the Keefer Coal Company of Illinois selected James N. Jarvis, and these two thus chosen, selected John C. Slade, as the third member. That thereupon said arbitrators accepted the performance of their respective duties, and proceeded to hold hearings on the question and dispute aforesaid, 'as to the quantity of merchantable coal within the terms and meaning of said lease,' and both parties have introduced evidence and said proceeding is now pending,

and undetermined and awaiting the decision of the arbitrators; and although the complainant avers, that it, in good faith, has offered evidence that completely proves the correctness of its contention that the amount of merchantable coal is short approximately 400 acres, and that nothing is due on July 1, 1927, yet the Keefer Coal Company of Illinois insists upon declaring a forfeiture of said lease. That the trustees in said mortgage have notified complainant that they have received the preliminary notice of default above mentioned, and have called upon complainant to pay the sum of $33,928.57, in order to avoid a default under the terms of the mortgage. . . . That if for any reason the arbitrators are unable to agree upon an award, or if for any reason said proceedings end without a decision of the question in dispute, as above set forth, then complainant avers that this court should take jurisdiction of the question in dispute, and determine upon a hearing in this cause, 'the number of acres of merchantable coal within the meaning of said lease'; and further, that the words merchantable coal as used in said lease when taken in connection with the written proposal of the said William W. Keefer, the actions and conduct of the parties should be construed to mean 'merchantable and recoverable coal,' by the usual process of stripping; and should said arbitrators decide said question, then this court in the event that either party desires to have a decree entered in reference to said award, that the court should enter such decree as equity and justice may require.''

The contract provides, concerning the binding effect of the award, that a decision of the majority of the board of arbitration is to be final and conclusive when made in writing, and a copy delivered to each party, by whom the costs and expenses are to be borne, is to be decided by the arbitrators. No suit at law or in equity based upon a dispute subject to arbi-

tration shall be instituted by either party, other than to enforce the award of the arbitrators.

The award which was made on September 27, 1927, by a majority of the arbitrators, is as follows: "The undersigned as arbitrators in the arbitration proceedings between United Electric Coal Companies, a corporation, and Keefer Coal Company of Illinois, a corporation, do hereby make the following decision and award: (1) That within the meaning of Section 2 of the lease between William W. Keefer of Pittsburgh, Pa., and Electric Coal Company, a corporation, of Illinois, executed May 14, 1923, as of May 1, 1923, the quantity of merchantable coal, surface measurement, in and underlying the premises therein described and demised, is, Eight Hundred Eighty-Seven and thirty-seven one-hundredths (887.37) acres; (2) That the results of the survey made by the engineers of the party, pursuant to the provisions of Section 2 of said agreement of May 1, 1923, disclose a deficiency of merchantable coal in said described premises of One Hundred and Twelve and sixty-three one hundredths (112.63) acres, on account of which the total rent reserve in Section 1 of said lease shall be reduced at the rate of Two Thousand ($2000.00) Dollars for each acre of such deficiency and the annual payments falling due January 1, 1926, and thereafter, ratably diminished, as provided in Section 2 of said lease. (3) The arbitrators have no authority or jurisdiction to determine how much of the merchantable coal in and underlying said demised premises is practically recoverable therefrom by stripping or otherwise. (4) That each party is to bear its own expense in the preparation for and presentation of its case to the arbitrator, including expenses and fees of counsel and witnesses; and the remaining expenses in connection with the arbitration, including the fees of the stenographer for reporting the testimony and furnishing transcripts, the charges for photostatic or other copies of exhibits, the

costs of printing the abstract of record and expenses of arbitration."

Objections to the validity of the award made by the appellee in its supplemental bill are as follows:

(1) That it does not determine the matter submitted to said arbitrators and purports to cover another separate subject matter and is beyond the jurisdiction of the arbitrators.

(2) That at the time of the execution of the original contract set forth in Exhibit 2, there was no then existing dispute between the parties, and that the provisions in said contract are for that reason null and void.

(3) That on Oct. 28, 1926, complainant complained that a dispute existed on the following questions, to-wit: (1) The amount of merchantable practically recoverable coal on the premises described in said lease; (2) the amount of the thirteen annual payments beginning January 1926 and thereafter.

We cannot agree with the appellee that its objections to the validity of the award are well founded. The arbitrators determined the real disputed questions between the parties which was submitted to them, and this is from the averments of the original bill and substantiated by the award itself: "The quantity of merchantable coal within the terms and meaning of the contract"; and "the amount of the thirteen annual payments to be made by the appellee, beginning January 1926 and thereafter." It is true, that the arbitrators did not determine "that at the time of the execution of the original contract set forth in Exhibit 2, there was no then existing dispute between the parties; and that the provisions in said contract are for that reason null and void"; nor did they determine how much of the merchantable coal underlying the leased premises was practically recoverable therefrom by the stripping method or otherwise. These matters were not within the legal and contractually fixed scope

of the arbitration; nor did they have any bearing upon the questions in dispute; nor was a determination of them necessary for a decision on the matters in dispute which were submitted for an award. We are of opinion that the award is valid and was made in accordance with the provisions of the lease contract; and that the award is complete and final settlement of the disputed questions submitted for arbitration and involved in this controversy; and that therefore the award should have been sustained and enforced by the circuit court. It is well settled law, that parties may agree to submit questions to the arbitrament of persons or tribunals other than the regularly organized courts; and such contracts are valid and will be enforced. *Pacaud v. Waite,* 218 Ill. 138.

For the reasons stated, the decree of the circuit court is reversed and cause is remanded with directions to render a decree finding that the matters in controversy concerning the rights and obligations of the parties to this litigation, which are the subject of this litigation, have been fully and finally settled and determined by the award of the arbitrators referred to, and order the award to be carried into effect.

*Reversed and remanded with directions.*