**Keefer Coal Company of Illinois, Appellant, v. The United Electric Coal Companies, Appellee.**

**Gen. No. 9,000.**

478

Heard in this court at the January term, 1937. Opinion filed April 16, 1937. Rehearing denied October 5, 1937.

SIMS & STRANSKY, of Chicago, for appellant; FRANKLIN J. STRANSKY, of counsel.

Acton, Acton & Baldwin, of Danville, for appellee; W. M. Acton, of Danville, of counsel.

Mr. Justice Riess delivered the opinion of the court.

The plaintiff, Keefer Coal Company of Illinois, a corporation, appealed from a judgment in assumpsit entered in the circuit court of Vermilion county in favor of the defendant appellee, the United Electric Coal Companies, a corporation, which judgment found the issues against the plaintiff under its amended declaration and in favor of the defendant in bar of suit upon a trial of said cause without a jury.

Plaintiff sought to recover the amount of certain annual and quarterly instalments of rents and royalties, and interest thereon in the sum of $163,419.20, alleged to be due and payable from the defendant to the plaintiff under the terms and conditions of a certain written lease of coal lands described therein, which instrument was entered into under date of May 1, 1923, by William W. Keefer and wife as lessors and Electric Coal Company as lessee. The rights and interests of the lessee were conveyed and assigned to the defendant company on May 4, 1923, and the interests of the lessor thereunder were so assigned to the plaintiff company on March 23, 1924.

Plaintiff's declaration, as amended, consists of the second amended count and common counts, under which the cause of action was limited by a bill of particulars to matters alleged and set up in the second amended count. A copy of the lease sued on was attached to the complaint, which latter alleged in substance that under the terms of the lease, the defendant was liable to the plaintiff for certain unpaid rentals at the rate of $119,624.28 per annum, payable quarterly in the sum of $29,906.07 during the remaining years of the lease expiring on December 31, 1938; that there so remained due and unpaid to the plaintiff from the

defendant certain rentals and interest thereon for a portion of the term of the lease between the years 1925 and 1932 in the amount of $119,555.50 unpaid rentals and $43,863.70 interest due thereon, the recovery of which is sought in this proceeding. The complaint contained a number of other allegations concerning the terms of the lease and transactions of the parties thereto.

The defendant coal company in its answer filed by leave of court under the present Civil Practice Act admitted execution and delivery of the lease in question and the subsequent transfer and assignment of the respective interests of the original lessor and lessee to the defendant and plaintiff herein; denied that there is any unpaid rental, royalty, or interest due the plaintiff from the defendant under the terms of the lease as alleged by the plaintiff, and averred that it had made payment in full of all amounts and annual and quarterly instalments of rental due the plaintiff thereunder; admitted that under the terms of the lease, the lessee became liable to pay a royalty of 25 cents per ton on all tonnage mined in excess of 542,857 tons per annum as alleged but averred that it was entitled to a credit under the terms of the lease for the amount of such excess payments, to be thereafter credited on rentals and royalties due in subsequent years in which there was a deficiency in production below such tonnage of 542,857 necessary to meet the fixed annual rentals due and payable quarterly for any such subsequent year during the term of the lease, and further averred that the amount of merchantable coal, surface measurement, as determined by the decision of the arbitrators (since held valid by this court) ''was, to-wit: 887.37 acres, instead of 1,000 acres; and that by reason of such decrease the total rental was reduced to $1,674,740, which reduction in rental reduced the annual payments beginning with January 1, 1925, and continuing for

fourteen years, to the amount of $119,624.28 per year, and made the quarterly payments $29,906.07'' and averred that all said accrued rentals had been fully paid under the terms of the lease.

Defendant further averred that the parties agreed that the proper construction of the lease was as above contended and that the defendant paid to the plaintiff all amounts due under the lease pursuant to said construction of the paragraph now in dispute. The plaintiff replied to the answer denying that the above was the true construction of the language or that such construction had been agreed upon, and alleged the true construction to be as set forth in its answer to defendant's counterclaim. In addition to its answer, the defendant filed a counterclaim praying certain equitable relief by reforming the lease, which was not granted by the court and no cross errors were assigned thereon; hence the same is not material to the issues herein. In its answer to the counterclaim, the plaintiff set up its contention as to the meaning of the paragraph in dispute and therein conceded the language in question, as written, to be ''incomplete, illogical, or unintelligible and did not clearly express the actual agreement and understanding between the parties intended to be expressed thereby.''

This litigation grew out of a mining lease of 1320 acres of land in Fulton county, Illinois, by William W. Keefer, the owner, to the Electric Coal Company, dated May 1, 1923, but actually executed a few days later, whereby the lessor leased the premises to the lessee for the purpose of mining and removing the coal during a period of 15 years and eight months, beginning May 1, 1923, and ending December 31, 1938. The lessee therein agreed to pay as rent the aggregate principal sum of $2,000,000 to be increased or diminished, however, at the rate of $2,000 per acre, if there were an overplus or deficiency in acreage of merchantable coal

in the premises to be determined by survey or arbitrators in the manner provided for in the lease.

The rent was to be paid in instalments: $25,000 on or before January 1, 1924; for the remaining eight months of 1923; $75,000 on or before January 1, 1925, for 1924; and $135,714.38 each succeeding year, payable in quarterly instalments of $33,928.57, beginning April 1, 1925, and so continuing during the remainder of the term ending on December 31, 1938. The rent of $2,000,000 was predicated upon a tentative estimate of 1,000 acres of merchantable coal, surface measurement, underlying the premises leased, valued at $2,000 per acre, and it was agreed that upon uncovering the coal a complete survey of the leased premises would be made by engineers of the parties to determine the quantity of merchantable coal in the premises, and if the survey showed more than 1,000 acres of merchantable coal, surface measurement, in the premises, the lessor should be paid by the lessee additional rent therefor at the rate of $2,000 per acre, and if the survey showed a deficiency of merchantable coal, a deduction would be made from the rent reserved of $2,000 an acre. Should any question arise between the parties as to the quantity of merchantable coal, provision was made in the lease for submitting the question to arbitration.

Brief reference to former litigation concerning the above lease will aid materially in clarifying the issues arising herein. In the case of *United Electric Coal Companies v. Keefer Coal Company,* 249 Ill. App. 222, this court affirmed a decree of the lower court enjoining the forfeiture of the lease in question for failure to pay rentals alleged to be in default until the amount of merchantable coal upon which rental was so payable could be ascertained and determined by the arbitrators to whom the question had been submitted by the parties under the terms of the lease. Subsequently, in the case of *United Electric Coal Companies v. Keefer Coal*

*Company,* 338 Ill. 288, the construction of paragraphs 1 and 2 of the lease contract were in issue. The cause so pending on appeal was transferred from the Supreme Court to this court on the ground that a freehold was not involved, and in that controversy, this court reversed a decree of the trial court and sustained the decision of the board of arbitrators, which had found and fixed the quantity of merchantable coal upon which rental was payable at the rate of $2,000 per acre under the terms of the lease to be 887.37 acres, and held that as to "the matter in dispute" there was "no ambiguity in the contract"; namely, the amount of merchantable coal and of rents payable under the provisions of said paragraphs. *United Electric Coal Companies v. Keefer Coal Company,* 261 Ill. App. 246.

In passing upon the question of whether or not the lower court erred in finding and adjudging that no rentals remained due and unpaid from the defendant to the plaintiff under the terms of the lease at the time the present suit was instituted, it becomes necessary to construe the language and meaning of section 3 of the lease, which provides as follows:

"If in any one or more years of this lease, the Lessee mines and removes from the leased premises tonnages of coal in excess of the following yearly tonnages, to-wit:

"(a) During the remainder of the year 1923—100,000 tons.

"(b) During 1924—300,000 tons.

"(c) During 1925 and the years succeeding, 542,857 tons each (a ton being 2,000 pounds) then and in that event the Lessee shall pay to the Lessor as additional rent for each such year in which the yearly tonnage above stipulated is exceeded, the sum of twenty-five cents (25¢) per ton for each and every ton of coal mined by the Lessee from the leased premises in excess of the said yearly tonnages hereinabove set out. Such addi-

tional rent shall be paid by the Lessee to the Lessor on or before the 15th day of January immediately following the close of the year for which such additional amount is due and payable. But the Lessee, in the event of its having to pay any such additional rent in any year or years during the term hereof, shall have the privilege during any succeeding year or years of this lease in which like additional rental amounts may accrue and be payable hereunder by reason of mining in excess of the said stipulated tonnages, of taking credit against such additional amounts thus due and payable for such succeeding year or years in an amount equal to the additional payment or payments theretofore made, such adjustments to be made on the said 15th day of January of each year.''

The defendant, United Electric Coal Companies, contended that said section 3 of this disputed clause means that, if in any year after 1924, the United Electric Coal Companies mined more than 542,857 tons of coal and paid for said excess at the rate of 25 cents per ton, that they could at any time thereafter take credit as against the specified payments provided in the lease in some subsequent year or years in which there was less than 542,857 tons of coal mined.

The plaintiff, Keefer Coal Company, contended that this section 3 means that if in any year, after 1923 and 1924, there was a tonnage of coal mined by the lessee in excess of 542,857 tons, that for that year, being the first year in which there was an excess over the stipulated minimum tonnage mined as provided in said section 3, the lessee (the defendant) should pay for the excess coal mined at the rate of 25 cents a ton in addition to the specified payments provided in the lease; and that if there was a deficiency in mining below 542,857 tons in a subsequent year or years, during the life of the lease, and then thereafter another year or years in which the coal mined exceeded the 542,857 tons

as specified, then in said subsequent year or years only in which there was coal mined in excess of 542,857 tons after the said deficiency in mining had intervened, the defendant could take credit for said deficiency against the said excess payment so due in said subsequent year or years; not to exceed, however, the amount of the excess paid in by the defendant during the said first year in which coal was mined in excess of 542,857 tons.

It is apparent that the latter part of section 3 is ambiguous and that its meaning is not clear, which fact is recited by both parties to this suit in their pleadings and shown by the evidence. The meaning of the words and the testimony offered by the parties as to surrounding facts and circumstances in the light of which the language is sought to be construed was sharply controverted at the trial.

Where the court, on preliminary examination, has determined that a contract is ambiguous or incomplete, extrinsic evidence, including evidence of the acts and conduct of the parties tending to show their interpretation of the contract is admissible to ascertain its true intent and meaning. Where the facts are controverted, the meaning of the language of a written contract is a question of fact, and in cases where the court is unable to determine the meaning of the contract, and it is necessary to receive extrinsic evidence to determine what the contract is, the court, if such evidence is contradictory, should submit the question of fact to a jury. *Schneider v. Neubert,* 308 Ill. 40; *Chicago Daily News, Inc. v. Kohler,* 360 Ill. 351; *Turner v. Osgood Art Colortype Co.,* 223 Ill. 629; *American Ins. Co. v. Meyers,* 118 Ill. App. 484.

In the case of *Chicago Daily News, Inc. v. Kohler, supra,* at page 363, the court, in passing upon the construction of a contract wherein the terms were ambiguous, stated that "the meaning of a written contract is ordinarily a question of law and not one of fact. If,

however, the construction of the agreement is dependent not only upon the meaning of the words employed but also upon extrinsic facts and circumstances or upon the construction which the parties themselves have placed upon the contract, and the facts are controverted, the inference to be drawn is for the jury. (*Turner v. Osgood Art Colortype Co.,* 223 Ill. 629.)''

This suit was tried before the court without a jury, and the finding of the trial court is entitled, on review, to the same weight of the verdict of a jury, and if the evidence is contradictory, such finding will not be reversed on appeal, unless it is contrary to the manifest weight of the evidence. *People ex rel. Drainage Commissioners v. Chicago & E. I. Ry. Co.,* 258 Ill. App. 535, 540; *F. B. Miller Agency, Inc. v. Home Ins. Co.,* 276 Ill. App. 418, 431; *Moore v. Molloy Co.,* 222 Ill. App. 295, 298; *MacCracken v. First Nat. Bank of Wheaton,* 204 Ill. App. 20; *Broderic v. O'Leary,* 112 Ill. App. 658.

It appears from the evidence that on March 18, 1924, William W. Keefer and Sarah Keefer, lessors named in the original lease and the Keefer Coal Company entered into a written escrow agreement with the defendant company, by the terms of which the payment of rents and royalties provided for in the lease were assumed by the defendant company as assignee, and the lessors and Keefer Coal Company sold the leased premises to the defendant company, conditioned on the payment of said rents and royalties, which escrow agreement and a warranty deed conveying title in fee simple to said premises was delivered in escrow to a certain bank therein named for delivery to the defendant company upon compliance with the terms of the lease. The escrow agreement further specified that at any time after two years from its date, the defendant company was given the right to anticipate payments of rentals specified in the lease by paying the bank the present worth of the remaining rentals

commuted on a 3½ per cent basis, in which event the lease would terminate and immediate delivery of the deed in escrow would be made to the defendant company.

It is also clear from the evidence and statements and admissions of the parties that the provision in clause 3 of the lease with reference to additional amounts to be paid at the rate of 25 cents per ton for all coal mined in excess of the amount therein specified for the year 1925 and succeeding years, was so inserted in the lease for the purpose of protecting the lessor against removal of all coal from the land during the early part of the term of the lease, and thereby impairing or endangering the security of the lessor during the latter years of the term in which subsequent payments of yearly rentals were to become payable under the terms of the lease.

After entering into the lease contract, the evidence shows that the defendant began the payment of the annual cash rentals provided for in the lease on the tentative basis of 1,000 acres of merchantable coal at the rate of $2,000 per acre; it so paid the fixed rentals for 1923, 1924, and 1925, and also paid before January 15, 1926, an additional royalty for the year 1925 of 25 cents per ton on all tonnage mined in excess of 542,857 tons referred to in the lease; that during the year 1926 and the first half of the year 1927, it so paid the cash rentals in addition to the excess royalties provided for on excess tonnage mined during said years. The annual rental of $135,714.28 referred to in the lease was based upon yearly payments on 1,000 acres of merchantable coal during that portion of the lease covering the years 1926 and 1938, inclusive. After the acreage was finally ascertained and determined by the arbitrators to be 887.37 acres in their decision which was sustained by this court, the yearly payments were decreased to $119,624.28, payable in quarterly instalments

of $29,906.07 during the latter 14 years of the term of the lease; previous credits at the higher rate having reduced the total balance of rentals so payable in 14 annual instalments to $1,674,740.

Under the construction of paragraph 3 of the lease as claimed by the defendant and as determined by the court below, the cash payments together with the excess tonnage mined in previous years credited against the deficiency under the amount of 542,857 tons mined in all subsequent years equalled the full amount of rentals and royalties due the plaintiff from the defendant under the terms of the lease to the date of July 1, 1935. The credits stipulated in evidence by the parties as having been so made aggregated the gross amount of $1,356,054.94; thus leaving subsequent rentals and royalties to be met and paid on the basis of $119,624.28 per year, payable quarterly, during the remainder of the term of the lease which expires on December 31, 1938.

It also appears that the amount of coal removed from the mine by the defendant prior to July 1, 1935, aggregated in amounts stipulated by the parties a gross tonnage of 3,968,838 so mined at 25 cents royalty per ton, and amounted to $992,209.50. It thus is apparent that the royalty value of all coal removed under the terms of the lease was far less in rental value than the amount of the rents and royalties received by the plaintiff from the defendant prior to July 1, 1935, and that the plaintiff was thus amply secured against excess removal of coal which might otherwise jeopardize in any manner the payments of the remaining rents or royalties annually falling due before the expiration of the term of the lease.

Under the construction placed upon the contract by the plaintiff the defendant would not be entitled to any credit for the excess tonnage produced during the years 1926, 1927, and 1928, as against deficiencies in produc-

tion under the amount of 542,857 tons per year during the succeeding years of 1929 to 1935 or any subsequent years of the lease, except in a year or years which might thereafter show an excess of production, whereby the plaintiff would be enabled to collect the fixed rentals in cash during all subsequent years without giving credit for excess payments so made during previous years of the contract, and to thus accelerate the collection of annual rentals contrary to the terms and intent of the instrument when construed in its entirety. *Minnesota Lumber Co. v. Whitebreast Coal Co.*, 160 Ill. 85, 96.

The intent of the parties as further expressed in the escrow agreement, which was made subsequent to the lease, gives the defendant the valuable optional privilege of commuting the payments during the latter years of the contract on a basis of $3\frac{1}{2}$ per cent less than the remaining unpaid instalments of rental provided for. When construed together, it is clear that this optional privilege given to the defendant is the only provision made by the parties for accelerating payments under the terms of the lease therein referred to, beyond the amount necessary to protect the plaintiff in collection of subsequent unpaid rentals. We have said in *Pennsylvania Retreading Tire Co. v. Goldberg*, 224 Ill. App. 241, at page 247, that "this court is loath to place a construction upon a contract which would permit one party to receive all the benefits, but deny the payment of the consideration to the other party on the ground that it was indefinite and uncertain."

In the case of *Minnesota Lumber Co. v. Whitebreast Coal Co., supra,* at page 92, involving the construction of an ambiguous coal contract, Mr. Justice Magruder used the following language: "Contracts should be construed in the light of the circumstances surrounding the parties, and of the objects which they evidently had in view. The circumstances, which both parties

had in view at the time of making the contract, may be referred to for the purpose of determining the meaning of doubtful expressions. Courts will seek to discover and give effect to the intention of the parties so that performance of the contract may be enforced according to the sense in which they mutually understood it at the time it was made; and greater regard is to be had to their clear intent than to any particular words which they may have used to express it. (*Doyle v. Teas*, 4 Scam. 202; *Torrence v. Shedd*, 156 Ill. 194.)''

In construing an agreement in question in *Lehmann v. Revell*, 354 Ill. 262, at page 284, Mr. Justice Shaw, in delivering the opinion of the court, there said that: ''We have frequently held that technical or grammatical construction must give way to the intention of the parties, and that the language used must be considered in the light of the surrounding circumstances.''

The testimony further shows that at the time of the hearing when the disputed questions concerning the amount of acreage on which rental was payable were submitted to the arbitrators, one of them, Arbitrator Slade, read the latter portion of clause 3 in the presence of H. A. Swallow, president of defendant company, and W. W. Keefer, original lessor and president of plaintiff company, and inquired if there was any dispute concerning the meaning of the language used. Witness Swallow gave his understanding of the meaning of the language as follows: ''I think that means that if at any year we mined less than 542,857 tons, we would be credited on the payment by reason of any prior payment we made on the excess year.'' Then Mr. Slade (one of the three arbitrators) said: ''I wanted to see whether that was perfectly clear. Is there any difference between you in figuring the amount?'' And Mr. Swallow said: ''No.'' And then Mr. Keefer said: ''That clause there at the beginning of this paragraph seems to be a little ambiguous, but Mr. Swallow, Mr.

Baker and myself finally construed it satisfactorily.'' Mr. Slade then said: ''Then there is no dispute there?'' Mr. Keefer then said: ''No.'' Swallow was corroborated in his testimony by the reporter, who had her original notes of what transpired at the hearing before the board of arbitration.

Witness Swallow further testified that on December 10, 1925, he met Keefer at the William Penn Hotel in Pittsburg; that Keefer inquired as to what was in the contract, and that he read paragraph 3 to him, and inquired of Keefer what his understanding of this paragraph was, and that Keefer replied, ''My understanding is, that if in any year you mine more than the minimum, you are entitled to credit on any deficiency in subsequent years.''

Plaintiff's attorney, Baker, who had written both the lease and the escrow contract, was present at this conversation at Keefer's request and wrote a letter to Keefer, upon return to his office, in which he stated that under the terms of the lease, the defendant could not charge for deficiencies for the years 1923 and 1924 out of the excess mined in 1925, and ''that taking of any credit for an additional payment'' was ''only available during succeeding year or years, that is, years succeeding the year 1925.'' A copy of this letter was mailed to the plaintiff and was an exhibit in evidence. It thus appears that Baker as attorney for plaintiff, had discussed the construction of clause 3 with both parties at the meeting between Swallow and Keefer at the hotel; that at the request of Keefer, he wrote Keefer as to his understanding of said clause. His construction at that time apparently was accepted by both parties and was in accordance with their declared understanding before the arbitrators in June, 1927, all of which was long prior to the filing of the suit herein. It also accorded with the original purpose for which the clause was inserted. In their oral testimony at the

trial, Baker and Keefer denied making the foregoing statements and denied that they had ever consented to the construction of the clause as claimed by defendant. The evidence on the facts was in sharp conflict and is within the province of the trial court to pass upon its weight and probative value. *Moore v. Molloy Co.,* 222 Ill. App. 295, 298; *People ex rel. Drainage Commissioners v. Chicago & E. I. Ry. Co.,* 258 Ill. App. 535, 540; *Schneider v. Neubert,* 308 Ill. 40, 43.

In the construction of contracts for the purpose of ascertaining the intention of the parties, the court will endeavor, by extrinsic evidence of such facts as the parties had in view, to place itself as nearly as possible in their position, so it may understand the language used in the sense intended by them. In seeking to ascertain the intention, regard will also be had to the practical construction, if any, which the parties, by their acts, have given the contract. So also, the acts of the parties themselves, indicative of their construction placed upon it, may be resorted to for the purpose of determining the true meaning of the written agreement and in this regard it makes no difference whether such acts are contemporaneous or subsequent. Moreover, where the contract is, in fact, understood by one of the parties in a certain sense and the other party knows that he so understands it, then the understanding is to be taken in that sense, provided this can be done without making a new contract between the parties. *Smurr v. Kamen,* 301 Ill. 179; *Weger v. Robinson Nash Motor Co.,* 340 Ill. 81.

"Where the terms of an agreement are in any respect ambiguous, and the parties have by their own acts placed a reasonable construction upon them, their interpretation will be adopted by the Court." *Chicago Daily News v. Kohler, supra; Burgess v. Badger,* 124 Ill. 288; *People v. Murphy,* 119 Ill. 169; *Schneider v. Neubert, supra.*

In the case of *Slack v. Knox,* 213 Ill. 190, the court said, ''It is permissible in construing a contract to look to the interpretation that the parties thereto have placed thereon in its performance, for assistance in ascertaining its true meaning. 'No extrinsic aid can be more valuable.' ''

In this case, the mooted clause was placed in the contract at the instance of the plaintiff and for his benefit and the contract was drawn by his attorney. In the case of *Pennsylvania Retreading Tire Co. v. Goldberg, supra,* at page 247, we said ''The contract was drawn by defendant's attorney. Defendant was therefore responsible for the language used, and if there is any ambiguity in the language it would seem to devolve upon the defendant to give an explanation of it. Moreover, courts will always, if possible, construe a contract so as to give effect to it and make it enforceable.''

''The language of a contract where it is doubtful and uncertain in its meaning should be construed most strongly against the party preparing it.'' *Evangelical Lutheran St. S. Cong. v. Bishop,* 213 Ill. App. 137; *Costello v. Delano,* 274 Ill. 426; *Conway Co. v. Chicago,* 274 Ill. 369.

Plaintiff appellant, in its brief, now contends that the decision in the case of *United Electric Coal Companies v. Keefer Coal Company,* 261 Ill. App. 246, is *res judicata* of the issues on the question of the construction of the meaning of section 3 of the lease. By no pleading nor answer in the lower court was this set forth or relied upon as a bar. A former adjudication cannot be asserted without pleading it. *Svalina v. Saravana,* 341 Ill. 236; *People v. Oakridge Cemetery Corp.,* 328 Ill. 53. Moreover, a careful reading of our opinion in that case clearly discloses that no construction of paragraph 3 was had and no reference thereto was made in the findings or decision of the arbitrators therein referred to.

This court, in the recently reported case of *Wright v. Logan,* 288 Ill. App. 481, at page 491, reiterated the well settled rule of law in Illinois that "to constitute a bar, a former adjudication must have been upon a matter actually at issue, the determination of which was essential to the decree, and it must conclusively appear that the matter was so at issue, that it was necessarily determined by the Court rendering the decree which is interposed as a bar, by reason of such estoppel." *Fineman v. Goldberg,* 329 Ill. 507, 511; *White v. Sherman,* 168 Ill. 589. The opinion in the former litigation referred to by the plaintiff, *supra,* did not undertake to pass upon the mooted language or provisions of section 3 of the lease.

The trial court, in passing upon and construing the ambiguous language contained in the third paragraph of the lease in question, heard the conflicting evidence offered by the respective parties concerning the intent and meaning thereof in the light of all the surrounding facts and circumstances in evidence and found the intent of the parties as set forth in the instrument to be as contended by the defendant and that under such construction the plaintiff had been paid in full all rentals and royalties due under the terms of the lease at the time of the disposition of the cause and accordingly entered a judgment in favor of the defendant in bar of suit. Under the law and the evidence, we cannot hold that the finding of the trial court on the controverted questions of fact was contrary to the manifest weight of the evidence, upon which the judgment was rendered, and having reviewed the entire record in the case, this court holds that no reversible error appears therein. The judgment of the circuit court of Vermilion county will therefore be affirmed.

*Judgment affirmed.*