# OCTOBER, 1940.

BRANDTJEN & KLUGE, INC., A CORPORATION, APPELLANT, V. JAMES A. HUNTER, DOING BUSINESS AS HUNTER'S TRI-STATE PRINTING COMPANY, RESPONDENT.—145 S. W. (2d) 1009.

Springfield Court of Appeals. Dec. 14, 1940.

Rehearing Denied Dec. 31, 1940.

*Robert M. Coleman* and *W. Raleigh Gough* for appellant.

*Roy Coyne* and *Emerson Foulke* for respondent.

TATLOW, P. J.—I. Appellant was the plaintiff below, and respondent was the defendant; the parties will be referred to in this opinion as plaintiff and defendant.

The plaintiff instituted this suit in replevin to recover possession of a 12 x 18 Kluge automatic printing press, and also a 10 x 15 Kluge automatic printing press, which it had sold to the defendant and for which the defendant had executed promissory notes and secured same by chattel mortgage. The petition prayed for a judgment against the defendant only for possession of the printing presses. Defendant admitted the execution of the promissory notes and the payments thereon as alleged in plaintiff's petition, and, in addition thereto, set up a counterclaim based upon the violation of the warranty contained in the contract of sale, in which he prayed judgment for damages in the amount of $5000; that he be entitled to retain possession of the presses; and that he be given judgment for the damages sustained over and above the face value of the notes. The plaintiff filed an answer to the counterclaim, and the defendant filed a reply to the answer. The pleadings will be referred to hereafter more in detail with reference to the several issues in the case.

. . We will first consider the plaintiff's contention with reference to its cause of action in replevin.

Laying aside the counterclaim, the mortgage was not fully paid when the suit was filed; a substantial sum remained due and unpaid, which constituted a default in the mortgage and entitled plaintiff to possession of the property on account of such default. At the close of all the evidence in the case the plaintiff requested the court to instruct the jury that its verdict must be in favor of the plaintiff upon plaintiff's cause of action for the possession of the personal property sued for, which the court refused to do, and to which the plaintiff duty excepted. This instruction is based upon the theory that it stood admitted by the defendant that without considering its counterclaim there was a substantial sum due on the mortgage, which made a *prima facie* case for the plaintiff and entitled the plaintiff to a verdict for the possession of the mortgaged property; in other words, that the vital issue in the case was as to the right of possession of the chattels, and that the value of the property and the amount of the debt were immaterial. Plaintiff further contended that it was necessary to have two separate verdicts, one in its favor for the possession of the property, and a separate verdict for the defendant for such damages, if any, that defendant had suffered by reason of the breach of the warranty; that the verdict of the jury was not responsive to the pleadings.

The verdict, which was in accordance with the instructions of the court as to its form, is as follows:

"We the jury find the issues in favor of the defendant upon plaintiff's cause of action.

"And we do further find the issues for the defendant upon his counterclaim and assess defendant's damages thereunder at the sum of $1200. Defendant to have charge of both printing presses.

"(Signed)      Robert E. Frazer, Foreman."

The plaintiff further contends that the jury should not have been authorized to set off the amount of the damages that it might find the defendant had suffered against the amount due on the notes, and, if such damages exceeded the amount due on the notes, to render its verdict in favor of the defendant for the difference.

With reference to this contention the plaintiff says: ". . . We did not dispute the proposition that the Court could then have 'offset' the verdicts—by providing that we could not have possession under our replevin action without first paying defendant the amount of his judgment under his counterclaim."

In support of this position counsel for the plaintiff has made a somewhat attenuated and involved argument with only an *obiter dictum* of the Kansas City Court of Appeals, in the case of Drennon v. Dalincourt, 56 Mo. App. 128, to support the argument. Where both a general and special property interest is involved in an action of

replevin, as in the instant case, the law has been clearly settled to the contrary by our Supreme Court from a very early date. It is said in the case of Kennett v. Plummer, 28 Mo. 142, 1. c. 145: "The modern doctrine is well established that a mortgage is but a security for the payment of the debt or the discharge of the engagement for which it was originally given, and until the mortgagee enters for breach of the condition, and in many respects until final foreclosure of the mortgage, the mortgagor continues the owner of the estate  .  .  ."

After condition broken, if the mortgage is on real estate the mortgagee can maintain ejectment. If it is on personal property he can maintain replevin; but the fact still remains that in neither case is the mortgagee the absolute owner of the property. He has only a lien thereon. The mortgagor is still the general owner of the property and the mortgagee has only a special interest therein. In the case of Dilworth v. McKelvy, 30 Mo. 149, 1. c. 154, the court laid down the rule as follows: "The present is the case of a lien for a sum of money due from the plaintiff to the defendant. When the money is paid the lien ceases, and the defendant has no longer any right to the possession of the property. The judgment should be for the value of the defendant's interest, or for a return of the property until that value is paid, at the option of the defendant. Of course, if the plaintiff chooses to pay the amount of the lien, the defendant has no alternative but to receive it, and his right to the possession of the property ceases. But the plaintiff may not see proper to tender the money, in which event a judgment in the alternative, to be determined at the defendant's option, will give the defendant the advantage of selecting between an execution to enforce a moneyed judgment and the possession of the property until his claim is paid."

In that case it is further said: ".  .  .  Here, the defendant only claimed a lien on the lumber sued for to an amount less than a fourth of its value, and he gets a judgment for four times the sum he claims, or for the return of the property, with the privilege of electing which of these judgments he will enforce.  .  .  ." (1. c. 153.)

A somewhat similar condition exists in the instant case. The plaintiff's petition alleges that, at the time the suit was filed, the value of the property was $2000, and the amount of the debt was $1709.95. The defendant had paid on the mortgage a total of $1680. Under the plaintiff's theory, where the defendant did not seek to rescind the contract but only sought to recover damages for a breach of the warranty, the correct measure of defendant's damages is the difference between the value of the property at the time of the sale and what would have been its value if it had been as warranted; and we think that this is the correct measure of the damages. If so, it is apparent that it would be an injustice to the defendant to permit the plaintiff to recover possession of the property by first paying the amount of the damages thus ascertained, and permit the plaintiff to

recover the possession of the property for which the defendant had paid a large part of the purchase price. In the case of Lewis v. Mason, 94 Mo. 551, 5 S. W. 911, 8 S. W. 735, the plaintiff, who had only a special interest in the property, obtained a judgment in a replevin suit for the full value of the property instead of for the value of his special interest, and for this reason alone, the court reversed the judgment upon the authority of Dilworth v. McKelvy, *supra*.

In the case of Lewis v. Mason, *supra*, Judge BLACK rendered a concurring opinion, in which it is said: ''.  .  . It makes no difference whether the party having a special lien on the property is plaintiff or defendant in the replevin suit. In either case his rights can be adjusted. As said in the case of Dilworth v. McKelvy, *supra*: 'The judgment in each case must be modified by the circumstances so that the merits of the controversy may be settled in one action. ·  .  .' '' [94 Mo. l. c. 558, 559, 8 S. W. l. c. 736.]

In the case of Smith v. Tucker (Mo. App.), 200 S. W. 707, this court says: ''.  .  . It appears that this plaintiff, Smith, is the general owner of the property in dispute, and defendant, Tucker, claimed to have an unpaid chattel mortgage on same. In order to enforce this mortgage the defendant Tucker replevined and thereby got possession of the property in the other case of Turner v. Smith. .  .  .'' [200 S. W. l. c. 708.]

It is further said in that case: ''Replevin suits are generally flexible enough to permit an adjustment of the real rights of the parties, and where the prevailing party has only a limited or special interest in the property instead of the ownership, and the other party has obtained possession under the writ, the value of such special interest only should be assessed. [Dodd, Brown & Co. v. Wilson, 26 Mo. App. 462, 468; Dixon v. Atkinson, 86 Mo. App. 24; Weber Implement Co. v. Dunard, 181 Mo. App. 658, 669, 164 S. W. 685; Gaston v. Johnson, 107 Mo. App. 590, 80 S. W. 276  .  .  .]''

In the case of Robertson v. Snider (Mo. App.), 86 S. W. (2d) 966, l. c. 968, it is again said, citing the case of Dilworth v. McKelvy: ·
'' '.  .  . Where the defendant has only a special interest in the property, the jury or court should assess the value of that interest. To assess the absolute value in such cases would lead to manifest injustice, as the result in the present case may serve to illustrate.'  .  .  .''

It is unimportant whether it is the plaintiff or the defendant who has only a special interest. In the instant case it is the plaintiff who has a special interest by reason of its mortgage. The defendant is the general owner of the property and has the right to retain possession of the property upon the payment of the amount due on the mortgage. The only case to be found in the Missouri decisions that apparently supports a contrary conclusion is the case of Drennon v.

Dalincourt, 56 Mo. App. 128, 1. c. 131, relied upon by the plaintiff. In that case the court says: ''The main issue which the jury were required to determine was whether the plaintiff was under his mortgage entitled to the possession of the chattels covered by it. Whether he was so entitled depended upon whether the note or any part thereof was unpaid, it being conceded to have been long past due at the commencement of the suit. If the note or any part of it was unpaid the plaintiff was *prima facie* entitled to the possession of the mortgaged chattels. It was unimportant as to the amount. . . .

''The jury, under the instructions, found for the plaintiff on the vital issue, that is to say as to the right of possession of the chattels. The suppletory finding in the same connection of the value of the property and the amount of the debt could not harm the defendant. . . .''

In that case there was no counterclaim and the question actually decided was that the finding of the value of the property was immaterial and could not and did not injure the defendant. The reasoning of the court is based upon the common-law conception that the mortgagee, after condition broken, was the absolute owner of the property. This was never the law of this State. Even after condition broken and until foreclosure the mortgagee only has a lien on the property with the right to possession thereof in a replevin suit; under all of the authorities the mortgagee's special interest should be ascertained and determined and the general owner of the property, whether he be plaintiff or defendant, is entitled, at his election, to pay the amount due on the mortgage and retain the absolute ownership of the property. The correct form of judgment in such a case is clearly set forth in the case of Dilworth v. McKelvy, *supra.*

It is true, of course, as said in the case of Drennon v. Dalincourt, *supra*: ''The main issue which the jury were required to determine was whether the plaintiff was under his mortgage entitled to the possession of the chattels covered by it. Whether he was so entitled depended upon whether the note or any part thereof was unpaid . . .''

In the instant case, if the defendant's counterclaim exceeded the amount that still remained due on the note (as the jury found that it did), then the plaintiff was, under its mortgage, not entitled to the possession of the presses. The fact that it is a counterclaim and not a statutory set-off does not change this self-evident conclusion. The defendant's claim could not have been brought into the case as a set-off for the reason that it was an unliquidated claim and not a debt, which is the difference between a set-off and a counterclaim. [Thayer-Moore Brokerage Co. v. Campbell, 164 Mo. App. 8, 147 S. W. 545.] A statutory set-off cannot only be brought into the case for the purpose of discharging the original debt, but, if it exceeds the original debt, a verdict and judgment can be rendered in favor of

the defendant, asserting the set-off for the difference, just as it could be if it were a counterclaim. Any liquidated debt can be brought into the case as a set-off, but, in order to bring in a counterclaim for an unliquidated debt sounding either in contract or tort, the counterclaim must relate to the same transaction. In either case, when a set-off or a counterclaim is pleaded, it becomes a part of a single controversy between the parties, requiring only one verdict and one judgment according to the facts. The amount recovered either on a set-off or a counterclaim can be set off against the special interest of the plaintiff in the presses. The rule is very clearly stated in Caruthersville Plumbing & Auto Co. v. Lloyd (Mo. App.), 240 S. W. 838, l. c. 839, as follows: ". . . If plaintiff's note with interest exceeds the amount defendant may recover on his counterclaim, then plaintiff would be entitled to recover in replevin, and his special interest in the truck may be determined, and judgment given accordingly. If, on the other hand, recovery on defendant's counterclaim should equal or exceed the amount of plaintiff's note, then defendant should have judgment for the difference, and plaintiff would fail in replevin."

We find nothing in any of the cases requiring separate verdicts, as contended by the plaintiff. If there is substantial evidence in the case entitling the defendant to have his counterclaim submitted, it is for the jury to determined the respective amounts, and the court did not err in refusing to direct a verdict for the plaintiff for the possession of the presses, unless the plaintiff was entitled to a directed verdict against defendant's counterclaim, which point we will next consider.

II. Plaintiff's contention that it was entitled to a directed verdict in its favor against the defendant's counterclaim is based upon the contention that its warranty was limited "to replace the part or parts claimed to have been defective and which, upon their return to use for inspection, we shall have determined were defective, and provided transportation charges for the parts so returned have been paid." If the plaintiff had stood strictly on the terms of its warranty and had, in good faith, determined that the alleged defective parts were not in fact defective, then, under the decision of this court in the case of Ajax Rubber Co. v. White, 216 Mo. App. 283, 264 S. W. 466, such determination of the question of whether the parts were defective would have been conclusive upon the defendant. To the same effect is Goltra v. Weeks, 271 U. S. 536, l. c. 547, 46 S. Ct. 613, 70 L. Ed. 1074, l. c. 1080. There was substantial evidence in the instant case that the plaintiff did not stand on its warranty but undertook to satisfy the dissatisfied customer by not only furnishing parts to replace the alleged defective parts, but undertook to and did install such substitute parts, at the place of business of the defendant in the City of Joplin. Having done so, it is not entitled to successfully

invoke the provision in the warranty: "The condition of this warranty is such that if the goods to which it applies are altered or repaired outside of our factory, our liability under this warranty shall cease." [Wayne Tank & Pump Co. v. Evans (Mo. App.), 15 S. W. (2d) 895.] The defendant's counterclaim allege that the plaintiff's mechanics and agents installed the new gears and parts at the defendant's place of business in the City of Joplin, which, while it does not use the word "waiver," is a sufficient allegation of waiver in the absence of a special demurrer or a motion to make more definite and certain. The defendant amplified its plea of waiver in its replication. The defendant's cause of action, of course, should be stated in its counterclaim and not in its replication, but on a retrial, if it desires, it can amend its counterclaim so as to more specifically plead the waiver of the provision above mentioned. Hence, it is our conclusion that the plaintiff was not entitled to a directed verdict in its favor for possession of the presses, or on defendant's counterclaim.

III. The trial court adopted and tried the case on the defendant's theory that the plaintiff, by its acts, had converted the special warranty into a general warranty. There is no basis for such a theory. In order to have done so there would have to be a new and additional contract of warranty, based upon a sufficient consideration to support it. The defendant does not plead a new contract and there is no evidence tending to prove the making of a new contract nor is there evidence of any consideration for such a new contract, if it had been made. [Moore v. Miller (Mo. App.), 100 S. W. (2d) 331; Richardson v. Landreth (Mo. App.), 260 S. W. 128.] The court clearly erred in trying the case on the theory that the special warranty had been converted into a general warranty by the acts of the plaintiff in this case.

IV. The fact that the warranty is a special and not a general one does not, of itself, prevent the defendant from recovering on its counterclaim. The acts of the plaintiff in installing the new parts in the place of those which the defendant claimed were defective, clearly waive the provision that if the alterations were made outside of its own factory, the obligation of the plaintiff should cease. It also waived the provision in the warranty making the plaintiff the sole judge of whether the parts which defendant claimed were defective, were in fact defective. This, too, even though the plaintiff, in good faith, after inspecting the alleged defective parts, determined that they were not defective. It is left for the jury to determine whether the parts were, in fact, defective as claimed by the defendant, or whether, although not defective, the plaintiff voluntarily undertook to satisfy the defendant by substituting new parts. We think there was ample evidence to justify the jury in finding the fact either way; that is, that the parts were, in fact, defective in material and workmanship, under normal use and service, or that they were not.

We also think there was substantial evidence from which the jury could have found that even though the original parts were not defective, yet, in making the substitution, the press was rendered defective by the installation of the new parts. We are not unmindful of the fact that the plaintiff denies in its replication to the defendant's counterclaim that it made the alterations. There is certainly sufficient evidence upon which the jury could have found that the plaintiff, in fact, did make the alterations. In fact we think the undisputed evidence shows that it did.

Exhibit "K," which was a letter from Rudolph to defendant, dated September 17, 1937, would seem to conclusively show that the plaintiff made the alterations. This letter says:

"I am pleased to inform you that our factory is going to ship to you a new cam gear with roller and stud and a new pinion gear for your Kluge Automatic Press.

. . . . . . .

"We ask that you please notify us when you receive these parts so we can arrange to have our erector install them as soon as possible and there will be no charge for this service."

Plaintiff's evidence with reference to this matter is as follows: "After that, we received the parts mentioned in that letter. After I notified him that the parts were here, Mr. Hoyt came down. We had to put the press out of commission. He took the cam gear off and put this new large gear on and the roller inside it. (Witness indicates the gear mentioned on Ex. B). That is a solid wheel with a groove on the back side that a roller runs in that moves the platen up and down; that groove is cut in an elliptical way and the cam runs in it and moves up this way and comes back (indicating). As this turns around the platen closes up.

"The other gear he put on is the pinion gear. Those are the gears they told me were causing the noise. After the gears were put on, he started the press in operation. When this gear was put on, this shaft extended out (indicating) where this arm would come around here, and it would hit that shaft and wouldn't turn it over. That is the shaft there (indicating). That iron hit it right there and couldn't turn it over. You couldn't force it past.

"I wasn't in the office at that time and I didn't know what he did until I got back and saw the press—saw that (indicating) cut out there, and I pretty near came running him out of the plant. He absolutely ruined the appearance of the press, and anyone that would look at it would see that it wasn't a perfect press; wasn't made that way. It wasn't supposed to be that way, and I asked him why he did, and then he told me that that came out there and couldn't turn it, and that is the way he fixed it."

Defendant's witness Earl Hoyt, who was the erector, testified as follows:

"The new parts were in a box when I got there. I uncrated them. In order to put on the parts, the press had to be taken all apart. On the other side of this shaft (indicating) there is a 'cam head' that had to be removed by a 'gear puller.' Then I slid the shaft out of the press. The shaft is about 30 inches long, it is round, about four and a half inches in diameter; there are 'offsets' on the ends for the cam gear and cam head to fit on. The cam gear is fit on this narrower end of the shaft about 1/16 inch from flush with the 'bevel.' When you put the cam gear on, about one-eighth inch of the shaft sticks out.

"When we took the 'cam head' off, the shaft and cam gear came out, all in one piece. Then I asked Mr. Hunter for the name of a good machine shop in town because, to remove the cam gear there, would kind of mess up his place a bit.

.   .   .   .   .   .   .

."When I asked for the name of a machine shop, Mr. Hunter himself, called a machine shop from his front office. A man came down in a truck. We loaded the shaft and cam gear on it, and also the new cam gear that was in the crate. I told the machine shop man I wanted the new gear pressed on the shaft exactly the same as the old one was on there.

"The old gear was a 1/16 inch from being 'flush' from the 'beveling.' The new gear was put on 1/16 inch further on the shaft, and the end of the shaft stuck out 1/16 inch more than it had from the old gear. The new gear was pressed right up to the beveling on the shaft."

Observe that the sole basis for the plaintiff's contention that it did not install the new parts is that their erector, Hoyt, asked the defendant to recommend a machine shop to actually do the work, which defendant did. But the evidence also shows that the work was done under Hoyt's supervision and without expense to the defendant. In addition to this, there would have been no occasion under the terms of the warranty for the plaintiff to have sent Hoyt, its erector, to supervise the alterations, if the defendant, and not the plaintiff, were making the alterations. The plaintiff would have performed its warranty by merely furnishing to the defendant the new parts to be installed by him; but it did not do so, and undertook to and did make the alterations itself, and thereby waived the right that it had to merely furnish the new parts to be installed by the defendant. Under all of the authorities, a waiver is but the intentional relinquishment of a known right. It requires no new consideration to support it, nor no element of estoppel. Hence the plaintiff is in no position to contend that it did not make the alterations. It is largely upon Rudolph's letter of September 17, 1937, *supra*, that the defendant bases his claim that the special warranty was converted into a general warranty. The letter contains also this paragraph: "We

are going to get the noise out of your press. You certainly have been entitled to it for a long time. I have had considerable correspondence with our factory and finally succeeded in getting them to ship these parts to you.''

Rudolph was the agent who made the sale of the presses to the defendant. Subsequently, and at the time that his deposition was taken in the case, he was not in the employ of plaintiff, but at the time that he wrote the letter he was in plaintiff's employ as the manager of its Branch Office in St. Louis. His deposition conforms to the statement in his letter that they were going to get the noise out of the press and that the defendant had been entitled to it for a long time. While he was a general agent of the company, so far as the evidence shows he was not the *alter ego* of the company for the purpose of mak- a new contract, and neither was there any consideration to support the changing of the special warranty to a general warranty, which would require the meeting of the minds of the parties, based upon a sufficient consideration. In addition to this, the letter shows upon its face, as does the other correspondence in the case, that Rudolph had no authority to make a new contract or an additional warranty. What he did in the premises was first subject to the approval of the home office and there is not a scintilla of evidence in the case that the home office authorized him to agree to take the noise out of the press, so as to become a general warranty of the fitness of the press. There was no new consideration and what he and the erector, Hoyt, did was clearly an attempt to perform, on behalf of the plaintiff, the terms of a special warranty.

V. The defendant in the instant case must recover on its counter-claim, if at all, on the theory that the terms of the warranty (making plaintiff the sole judge of whether or not the parts, under normal use and service, were defective in material and workmanship, and providing that there should be no liability under the warranty unless the repairs were made at plaintiff's home office) have been waived by the acts of the plaintiff. But, even with such waiver on the part of plaintiff, the defendant must still show that the parts were, in fact, defective in material and workmanship under normal use and service, so as to render the press of less value than it would have been if the parts had not been so defective.

VI. There are numerous objections in this case, both as to the introduction of the evidence and as to the instructions given and refused, which it is not necessary for us to consider in detail; to do so would require us to lengthen the opinion considerably and it is already too long. It is sufficient to say that, upon a retrial of the case the court should not permit the witnesses to state their memory of what is contained in the letters. The letters are available and should be permitted to speak for themselves. Neither should the

defendant be permitted to prove the declarations of agents of the plaintiff except as such declarations are a part of the *res gestae* of the particular act that the agent was performing for the plaintiff at the time the declarations were made.

The plaintiff in this case strenuously objects to the action of the court in admitting testimony as to the rated speed of the large press, which is the only one in controversy. We agree with the plaintiff concerning this contention. To permit the defendant to offer in evidence the "rated speed" of the press as shown in its circulars (which is neither more nor less than sales talk) is equivalent to permitting the defendant to change the special warranty into a general warranty of fitness and capacity. The special warranty is perfectly plain and unambiguous. It expressly provides that no agreements or representations have been made by said first party unless contained in the warranty, and that the contract constitutes the entire agreement of the parties. The express limitations in the warranty clearly exclude an implied warranty of general fitness and capacity. [Little v. Widener, 226 Mo. App. 525, 32 S. W. (2d) 116, and other cases cited in appellant's brief.] Such evidence was highly prejudicial to the plaintiff and should have been excluded. The defendant seeks to escape this conclusion by citing authorities to support the elementary rule that, if the evidence is admissible for any purpose, it cannot be excluded; but it cites no authority to show that such evidence as to the speed and capacity of the machine was admissible for any purpose. To permit such evidence converts the special warranty into a general warranty of fitness and capacity, which is in direct conflict with the rule plainly announced in the authorities, *supra*.

The defendant is entitled to prove, if he can, that the press, under "normal use and service," is "defective in material and workmanship," and, by reason of such defect, makes more noise than it would if not so defective, which renders the press of less value on account of such defects. He is also entitled to prove, if he can, that the capacity of the press is less than it would be if it were not so defective. But the jury should be instructed that neither the excessive noise nor the lack of capacity entitles the defendant to recover damages therefor on account of said defects in the press unless such press, under normal use and service, is defective in material and workmanship so as to bring it within the terms of the warranty. The mere fact that the press makes excessive noise in its operation, or that its capacity is less than the rated capacity, or that its capacity is less than the capacity of other presses sold by the plaintiff, does not entitle the defendant to recover damages therefor, as the warranty neither warrants that the press will not make an excessive noise in its operation or that the press will be of any particular capacity. Either or both of such defects, in order to entitle the defendant to recover on its counterclaim, must be the result of, and caused by defective ma-

terial and workmanship. Such excessive noise and lack of capacity would no doubt be competent evidence if there were a general warranty of fitness and capacity. The defendant evidently thinks that, in any event, the evidence would be competent to establish the measure of damages. This would not be so, even if the warranty were a general one. The defendant would only be entitled to recover damages for the difference between the value of the press in its defective condition and what would be its value if it were not defective. The defendant would not be entitled to recover, in addition to such damages, the loss that it suffered in operating the press before the suit was brought. When the defendant elected to keep the machine, the difference in its value, defective as it was, and what it would have been if not defective, covers any loss that the defendant might suffer by the operation of the defective machine prior to the institution of the suit, or, for that matter, throughout the life of the press. The instructions in this case permitted the defendant to recover on its counterclaim, duplicate damages: The difference between the value of the press, defective and without defects; and for the damages on account of the loss in operation of the defective machine to the date of trial—which is partly the same damages under a different name.

VII. In our judgment the issues to be tried in this case are:

1. Whether, "under normal use and service," the original parts were, as defendant contends, defective "in material and workmanship." If they were so defective and the jury so finds, the defendant is entitled to recover upon his counterclaim the difference, if any, between the value of the press at the time it was delivered and what its value would have been if it had been as warranted.

2. If the jury finds that the press was originally defective and was rendered further defective, "under normal use and service in material and workmanship," by the substitution of the new parts, then the defendant is entitled to recover on its counterclaim the further sum as the difference, if any, between the press in 1937, at the time the new parts were substituted, and what it would have been if there had been no substitution.

3. If the press was not originally so defective but was, by the substitution of the new parts, rendered defective within the terms of the warranty, then the defendant's damages are limited to the difference between the value, if any, of the press at the time of the substitution and its value immediately after the substitution. In any event, defendant's damages under its counterclaim are to be limited to the difference, if any, between the sum of $2000, which the counterclaim allges would have been the value of the machine if it had been free of defects, and the value of the press in its defective condition. As to the measure of damages, the jury should be instructed to ascertain and determine: First, the amount that is due upon plaintiff's notes, computed under the rule announced in Riney v. Hill, 14 Mo. 500

(unless the parties can agree on the amount still due). Second, the amount of the damages that the defendant has suffered by reason of the defects, if any, in the material and workmanship of the machine under normal use and service, measuring such damages by the difference between what the machine was worth at the time of its delivery and what it would have been worth if it had been free from such defects. Third, if, by the substitution of the parts in 1937, the machine was, under normal use and service, rendered more defective in material and workmanship, there should be added to such sum the additional damages on account of the substitution. If there was no defect in the parts originally installed and the machine was rendered defective as aforesaid by the substitution in 1937, then defendant's damages should be the difference between the value of the machine immediately before and immediately after the substitution. Fourth, if the amount due upon the note exceeds the amount of the defendant's damages, if any, the verdict should be for the plaintiff, in accordance with the rule laid down in the case of Dilworth v. McKelvy, *supra*. Fifth, if the defendant's damages should exceed the amount due upon the note, then the verdict should be against the plaintiff for the recovery of the property described in the mortgage, and in favor of the defendant for the excess over and above the amount due on the note.

The case is reversed and remanded for a new trial, in accordance with this opinion. *Fulbright, J.,* concurs; *Smith, J.,* concurs in the result.