George Knorr, Plaintiff-Appellee, v. White Brothers Trucking Co., an Illinois Corporation, Defendant-Appellant.

Gen. No. 66–84.

Second District.

February 21, 1967.

Rehearing denied March 31, 1967.

Redman and Shearer, of St. Charles, for appellant.

Goldman and Jacobsen, of Rockford, for appellee.

MR. JUSTICE SEIDENFELD delivered the opinion of the court.

This appeal involves an interpretation of terms used in eight equipment leases entered into over a period of years between White Brothers as the truck carrier and Knorr as the owner of the augmented equipment.

The first lease was entered into on November 9, 1959, for the one tractor-truck then owned by Knorr. The lease was a standard form and there was typed in the space governing payment: "determined by trip." Over the following three years Knorr added additional units and five new leases were entered into with identical language. A copy of the leases was kept in the respective trucks as required under Commerce Commission regulations. On June 4, 1963, after one of the trucks had been stopped by a Michigan Public Service agent who objected to the absence of specific payment terms in the lease, a new lease was entered into on the same form except that it provided, in place of *"determined by trip"* the language *"75% of the revenue less trailer rental, if applicable."* Thereafter, on January 1, 1964, another lease was

executed with the same terms. Knorr discontinued operations for White in *the early* part of 1964.

Under the eight leases some 3,581 loads were hauled by Knorr to various points within Illinois and surrounding states, and payments totalling $286,776.26 were made by White to Knorr over the entire period of the leasing operations. These were by check from time to time, usually weekly, after billing shippers. The accompanying vouchers contained no breakdown as to any amounts deducted. However, there is no dispute as to any deductions except those for "unloading charges."

The evidence shows that over the entire period in question, beginning in 1959, payment was computed on the basis of 75% of the gross revenue, with a 15% of the 75% figure being deducted only for unloading of loads to a certain Lock Joint Company.

The dispute essentially concerns an interpretation of the leases to determine whether by the terms or by reason of a latent ambiguity, White properly deducted these unloading charges. The trial court ruled that the agreement was for 75% of the gross revenues throughout and that such deductions were improperly made. He awarded Knorr the sum of $38,933.71 on that basis. A claim for a setoff of $38,636.27 for alleged overpayments to Knorr arising from erroneous application of tariffs was denied.

White argues that the agreement at all times was to deduct the unloading charges on the Lock Joint shipments; that the acceptance of payment on that basis for some three and one-half years without objection determines the meaning of the language used in the leases by the practical construction of the parties. He further argues that if Knorr is entitled to disaffirm the acceptance of payments over the period, he must likewise account to White for any overpayment over the same period.

Knorr's position is that the evidence sustains the trial court's determination, particularly when interpreted with

reference to provisions of the Interstate Commerce Act which he claims make it illegal to prefer a customer by not charging him for unloading.

■ ■ We first consider the effect, if any, of the regulations of either the Federal or State Commerce Commission on this case. These acts (USCA, Title 49, c 8, §§ 302–304; Ill Rev Stats 1963, c 95½, § 282.1–30, and tariff rules thereunder) do not purport to apply to a lease between a carrier and his augmenting equipment owner, and as between them they were free to enter into a lease providing for any mutually satisfactory arrangements and deductions. The acts are for the protection of the public in its dealings with carriers and provide for penalties for violations which could result in discrimination as between members of the public using the services of a carrier. See 4 ILP 266; 60 CJS 266.

In fact, there is no evidence in the record to show that Lock Joint was preferred. The evidence clearly shows that the reason for the carrier unloading these shipments was for the convenience of both the carrier and his lessor, Knorr, to avoid delays which would have made the equipment unavailable for considerable periods for continuance of other paying shipments, to the disadvantage of both parties. There is no evidence that Lock Joint requested the unloading service which would be a precedent under the terms of the Commerce Commission Acts to its being either obligated or preferred.

■ This court will review the evidence on the issue of a latent ambiguity in the leases, applying the usual standard that the trial judge's findings on the facts will not be reversed except for a clear abuse of discretion; or, in other words, except if the trial court's findings are clearly and manifestly against the weight of the evidence. Stevens v. Fanning, 59 Ill App2d 285, 294, 207 NE2d 136 (1965).

*Carl Edward Berquist* testified for Knorr. He was the branch manager of White in South Beloit. He spoke with Knorr and signed the November 9th lease which contained the terms "determined by trip." He had been told by his main office in Wasco that this phrase meant 75% of the revenue less trailer rental, if applicable. He had also been instructed by the main office that if there were any question of rates, the trucker should be referred to the main office. He kept daily records of the weights carried, the ticket number, the number of pieces and the identity of the commodity. He was told by the main office to change the leases of January 1, 1964, and June 4, 1963, to state "75% less trailer rental if applicable." He did not discuss any other charges or deductions with either Knorr or White. He had heard from other drivers that there was an unloading charge but never discussed it and always referred matters of pay to the home office. A few times Knorr discussed his checks with him if he thought there was a load that he hadn't been paid for, but Knorr never mentioned the rates or amounts he was paid. He was discharged on March 14, 1964.

*Howard C. Krause* testified for Knorr. He audited information furnished by Knorr only to assess the mileage rates and had no knowledge of loading or unloading.

*Knorr* testified that he talked to Berquist "about the revenue" a number of times and was told to go down to Wasco to find the information. In the last part of October, 1963, he took a truck off and put it with Logan Trucking which paid 80% instead of 75%. He mentioned it to Berquist, who couldn't see where the difference was. That is when he realized he wasn't getting the full 75%. He never talked to anybody at White Brothers. Later, on cross-examination, he testified that he talked to White maybe a half-dozen times but not more than ten times. He "couldn't remember" if in any of the conversations he asked for a breakdown. He was hauling sewer pipe

for Logan which is much lighter than Lock Joint pipe and is rolled off the back of the trailer. The Lock Joint type of pressure pipe took special unloading equipment. It was to his benefit to have equipment for unloading and this would increase the loads that could be made. He would take the trailers out to Lock Joint, leave them and have the tractors available for other jobs.

He knew that White Brothers' rates were on file and he could get them by asking, but he never did. He knew of both the intrastate and interstate tariffs. He ran approximately 3,500 trips before he checked up to see what White was paying. He was in the Wasco office maybe five times in 1961. He never asked anyone in Wasco to see a tariff, although he did ask Berquist, who told him they had them down at Wasco. He knew he could check the tariffs at any time, but didn't.

He kept his own records at all times as to weights and mileage. He had checked the Lock Joint records as to weights against the vouchers from White Brothers.

He had been in the trucking business since 1955.

*Howard Martin Hess,* for Knorr, testified that he leased a truck to White in November or December of 1959 and was told by Berquist he would get 75% of the revenue less trailer rental. He continued to work for Knorr to December of 1963. Any complaints on loads were straightened out at Wasco.

*Edward N. Shea,* for Knorr, testified that his company was Logan Trucking, Inc. Knorr was one of his truckers on lease and Knorr paid unloading charges on Lock Joint loads and had done so for four or five years. Such charges are by agreement according to leases and do not concern the shipper. His tariff has nothing to do with the lessor of equipment; it is a matter of contract.

*Leroy Melvin Schroeder,* for Knorr, testified that on his leases with White in 1962 he was paid 72% but the written lease read "determined by trip." He understood trailer rental was 15%. He checked with Wasco on rates

and was referred to Berquist who said he didn't have the information.

*Kenneth Anselment* testified for White Brothers as its general manager at Wasco, Illinois. He talked to Knorr more than a half-dozen times in 1961 and Knorr was told that he was getting 75% less the unloading charges. In early 1961 he had a conversation with Knorr who asked him if there wasn't something he could do about the unloading charges. He told Knorr that there would have to be the charge if White Brothers was to unload. At other times Knorr brought this up. Schroeder was charged the same for unloading. He had conversations with Berquist early in 1963 about writing leases and told him that they were to state unloading charges. When Berquist left, the new manager included deduction for loading and unloading where applicable and this was not a change in policy.

*George C. Scanlon* testified for White as a transportation expert. He went through some 3,000 tickets using the receipt number, the number of pieces, type of pipe, and the diameter and calculated everything according to Commerce Commission rules and tariffs. He arrived at an overpayment to Knorr of $38,636.27. He had no idea at to whether the number of trips might be 857 trips short. His audit was based on driver-receipts and not on the original bills of lading which would show the actual amount of revenue as charged to shippers.

■■ There is no dispute as to the applicable rule of law that a contract is to be enforced according to the sense which the parties mutually understood it at the time it was made, with greater deference given to their clear intent rather than to any particular words which they may have used to express it. Stevens v. Fanning (supra) ; Keefer Coal Co. v. United Elec. Coal Cos., 291 Ill App 477, 485–486, 10 NE2d 210 (1937). In ascertaining the parties' intention, regard will be had to the practical construction the parties have given it. Weger v. Robinson Nash Motor Co., 340 Ill 81, 91, 172 NE 7

(1930) ; M & J Diesel Locomotive Filter Corp. v. Nettleton, 56 Ill App2d 146, 151, 205 NE2d 659 (1965). No extrinsic aid to interpretation can be more valuable. Walters v. Walters, 409 Ill 298, 304, 99 NE2d 342 (1951).

While Knorr claimed he had no knowledge of the unloading charges and deductions, this is patently unbelievable in view of the whole record. The specific conversations testified to by White and Anselment, that each discussed with him the unloading charges, were not refuted by Knorr. Although he took the stand two different times after such testimony was in the record, he did not refer to these conversations or refute them, but testified relative to various tickets and was not directed to any testimony as to his knowledge of the unloading deductions beginning in 1959. His prior testimony was that he had no conversations with White, while on cross-examination he admitted that he had a number of conversations, but he "could not remember" whether he ever asked for a breakdown of the charges. It is undisputed that in all of the payments to him beginning with his employment in 1959 and continuing to the end of his service for White in 1964, the amount paid was after the unloading deductions, whenever applicable. It is undisputed that he kept his own weight and mileage records and in fact verified the Lock Joint weights. He had access to the applicable tariffs so that he at all times could have determined whether he was being paid on the basis claimed by him as the agreement, or on the basis of the agreement testified to on behalf of White Brothers. He was an experienced trucker even prior to the arrangement with White Brothers.

 On this state of the record, the trial court's findings as to the real agreement of the parties and its resolution of the issue of a latent ambiguity in the leases is clearly and manifestly against the weight of the evidence. The record clearly shows that the practical construction given to the language in the leases throughout

was that Knorr was to receive 75% of the revenues, less trailer rental where applicable (about which there was no dispute), and less a 15% deduction for unloading of the Lock Joint shipments.

The judgment of the trial court awarding Knorr $38,636.27 is reversed. It therefore becomes unnecessary to rule on the claim for a setoff as no cross appeal was filed.

Reversed.

MORAN and ABRAHAMSON, JJ., concur.