**MODINE MANUFACTURING COMPANY, a corporation, Respondent,**

v.

**M. F. CARLOCK, Appellant.**

**No. 57139.**

Supreme Court of Missouri, Division No. 2.

May 13, 1974.

Motion for Rehearing, Modification or Transfer to Court en Banc Denied June 10, 1974.

Frank N. Gundlach, Thomas E. Wack, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, for respondent.

Campbell & Campbell, David L. Campbell, Morris M. Rosenthal, St. Louis, for appellant.

HOUSER, Commissioner.

Modine Manufacturing Company, the corporate successor to American Foundry and Furnace Company, sued M. F. Carlock on an open account for $10,677. Carlock filed an answer and a counterclaim for $150,000 damages. Tried to the court without a jury judgment was rendered for Modine for $12,506, including interest, on the petition, and for Modine and against Carlock on the counterclaim. Carlock appealed prior to January 1, 1972.

We review the case upon both the law and evidence as in suits of an equitable nature, not setting aside the judgment unless clearly erroneous and giving due regard to the opportunity of the trial court to judge of the credibility of the witnesses. Rule 73.01(d), V.A.M.R.; Public Water Supply Dist. No. 8 v. Maryland Casualty Co., 478 S.W.2d 293 [1] (Mo.1972). The law of Illinois, where the contracts in question were made and performed and the transactions occurred, governs the substantive contractual rights of the parties. Schoene v. Hickam, 397 S.W.2d 596 [5] (Mo.1965).

On November 8, 1960 American and Carlock signed a printed form of Manufacturer's Agreement naming Carlock as a Distributor (Exhibit 1). Par. 1 granted to Carlock "a franchise to sell" designated heating and ventilating equipment and air handling products of American in Cook, Lake and DuPage Counties in Illinois. In Par. 3 Carlock agreed "to confine his selling activities to customers located" in that territory, and that in instances in which Carlock's customer directed delivery of products to its affiliates located in another

distributor's territory Carlock should work out with the distributor in that other territory, in advance of consummation of sale, a satisfactory installation and service arrangement, including compensation. Par. 4 provided:

"In *only* those instances set forth below we reserve all rights without limitations to sell within Distributor's territory either direct or through others any products without any obligation to pay Distributor any commission or other charges on the following sales.

\* \* \* \* \* \*

"(a) To the United States or any State Government or any department or bureau thereof.

"(b) To Manufacturers who install such equipment in or with their products.

"(c) To the following established Sales Outlets.

Powers Regulator Co. and their Sales Outlets.

Barber-Colman Co. and their Sales Outlets."

Par. 5 required American to assist Carlock in developing the territory by personal calls, mailings, and trade journal advertising, and to "direct all inquiries received from the territory" to Carlock. Par. 7 provided: "Manufacturer's prices to Distributor shall be the same as those extended to all other Distributors." In Par. 8 Carlock agreed to pay American on every shipment of its products "Distributor's price from Manufacturer in effect at the time of such shipment and on the following terms: 2%—10 days—Net 30 days, F. O.B." American, at Bloomington, Illinois. Carlock agreed to pay all installation and service costs. Par. 16 provided: "This agreement shall continue in force and govern all relations and transactions between parties hereto until terminated. Either party may terminate this agreement upon thirty (30) days written notice." Par. 18 provided that Carlock was not the agent or legal representative of American and had no authority to obligate or bind American in any manner. Par. 20 provided: "It is declared by both parties that there is no oral or other agreement or understanding between them affecting this agreement or relating to the selling, installation or servicing of products. This agreement supersedes all previous agreements between the parties."

During the first year of Carlock's activities in the Chicago area, beginning in March, 1961, he operated on salary as an employee and not as a manufacturer's representative. American realized all profits from his sales. He billed customers on his own stationary. When payment by check was made Carlock endorsed the checks to American.

After the first year Carlock operated as a manufacturer's representative. He was a sole proprietor. He bought items from American and resold them at prices determined by him. His profit was the difference. American would send Carlock an invoice a few days after shipment of goods purchased by Carlock and mail monthly statements of account.

American was merged into Modine in 1965, and all references to "American" are to be understood as including its successor Modine, where appropriate. Modine assumed American's contractual obligations. Carlock's representation of Modine was terminated as of October 31, 1966.

Modine brought this action April 27, 1967 to recover items allegedly due on open account between June 29, 1964 and May 31, 1965. Carlock filed an answer July 25, 1967, amended May 15, 1970, asserting offsets and credits of $2,060 on account; offsets and credits by way of counterclaim, and the affirmative defense of breach of contract. Carlock filed a counterclaim October 6, 1969, amended May 15, 1970, seeking $150,000 damages for breach of the written contract and alleged oral agreements.

The case was tried to the court without a jury. Modine called Carlock as its only witness and offered 13 exhibits in evidence. Carlock testified in his own behalf on his answer and counterclaim and called as witnesses Charles Hopper, an engineer, and Henry Sharp, a manufacturers' representative who testified as an expert on customs and usages in the trade. The former sales manager and the former president of American testified in rebuttal. Carlock offered 301 exhibits in evidence, 295 of which were received. The exhibits consisted of the printed Manufacturer's Agreement, correspondence, memoranda, purchase orders, invoices, credits, debits, checks, interoffice communications, drawings, specifications, computations, documentary memorials of innumerable business transactions between American or Modine and Carlock, other distributors, customers and purchasers, extending over a 5-year period, and lengthy interrogatories and answers.

The trial court's order deciding all issues on both petition and counterclaim for Modine and against Carlock was accompanied by written findings of fact and conclusions of law.

### On Carlock's Counterclaim

The areas of disagreement are as follows:

Whether the counterclaim, or any part of it, is barred by the statute of limitations.

If not, whether the distributor's agreement, Exhibit 1, is ambiguous, thereby authorizing admission of extrinsic evidence of the contractual obligations of the parties.

If so, of what terms the complete agreement consists.

Whether Carlock's territory was exclusive, and the perimeters of exclusivity.

Whether American and/or Modine made sales and/or shipments of their products into Carlock's exclusive territory in violation of the contractual arrangements.

If so, the amount of damages, if any, to which Carlock is entitled on this feature of the case.

Whether engineering and consulting work performed by Carlock effecting specification of manufacturer's products resulting in sales outside Carlock's territory were compensable under the contractual arrangements; whether in fact such specifications occurred through Carlock's efforts, for which he was not compensated, and the amount of damages, if any, to which he is entitled on this feature of the case.

Whether Carlock was entitled to additional amounts under the sales bonus discount plan for his activities during the years 1962–1965, both inclusive.

Whether American allowed other distributors and other firms greater discounts than those allowed Carlock, in violation of the contractual arrangements of the parties, and if so the amount of damages, if any, to which Carlock is entitled on this score.

Whether American refused to cooperate with Carlock in developing his territory, in violation of its contractual obligations, to his damage.

### Statute of Limitations

Modine alleged in both Counts I and II of its reply to Carlock's counterclaim that each count "is barred by the applicable Statutes of Limitations of both Illinois and Missouri." Modine failed to plead or specify what particular limitation statute of either state was applicable, either by reference to a section number or by stating the number of years which it was claimed effected a bar; without stating facts showing that the counterclaim was barred by limitations, and without alleging that the statute of limitations of either state operated to extinguish the

cause of action itself and not merely bar the remedy. For these reasons the defense of limitations is not available under the lex fori, which governs with respect to the limitation of actions. Nelson v. Browning, 391 S.W.2d 873, 880 [17] (Mo.1965). The statute of limitations is a defense which must be set forth affirmatively. Rule 55.-08. "A party desiring to avail himself of the statute of limitations must plead the particular statute upon which he relies. Vail v. Jacob, 7 Mo.App. 571; Hunter v. Hunter, 50 Mo. 445." Murphy v. De France, 105 Mo. 53, 62, 15 S.W. 949, 951–952 (1891). In Knisely v. Leathe, 256 Mo. 341, 166 S.W. 257 (1914), this Court held that one seeking to take advantage of the statute of limitations "must plead the very provision on which he depends." 166 S.W. l.c. 261. In Gibson v. Ransdell, 188 S.W. 2d 35 (Mo.1945), where the bar of limitations was invoked but an inapplicable section was specified, it was held that the cause could not be ruled upon the basis of that statute of limitations, and reannounced the rule that " * * * the particular statute relied upon must be pointed out," 188 S.W.2d l.c. 37, citing Knisely v. Leathe.

■ Throughout the trial of the counterclaim counsel for Modine made numerous objections to the introduction of evidence on the ground that the claims were barred "by the Statute of Limitations," but the defense may not be invoked by objecting to testimony. Vogel v. Kennedy, 127 Mo.App. 228, 104 S.W. 1151, 1153 (1907).

### Ambiguity?

■ In ruling that the terms of Exhibit 1 are "clear and ambiguous" the trial court fell into error. Exhibit 1 is ambiguous and uncertain with respect to several matters of importance which usually and customarily inhere in the relationship between manufacturers and their representatives. It fails to incorporate the entire agreement and in numerous respects had to be supplemented by oral agreements and understandings, course of dealing of the parties and customs and usages of the trade, in order to be workable. Its language was ambiguous in many details. The provision granting Carlock "a franchise to sell" does not explicitly state whether the franchise is exclusive or nonexclusive. Carlock's agreement to confine his "selling activities" to customers located in the named counties leaves room for more than one interpretation of the quoted words. Neither the word "sale" nor the words "sell within Distributor's territory" are defined in Par. 4. Asterisks beside Pars. 16, 18 and 20 refer to the following words at the end of the terms of the agreement: "*Applicable after 12–30–60," and Exhibit 1 contains the words "Effective January 1, 1961," but it was conceded that at the time Exhibit 1 was dated (November 8, 1960) both parties intended that Carlock go to Chicago and work there for a year on salary before the status of manufacturer's representative under Exhibit 1 should commence. The prices to be charged Carlock after the effective date of Exhibit 1 are not fixed by reference to any prescribed standard. The meaning of American's promise to direct to Carlock "all inquiries received from the territory" is speculative. Tht consequences of American taking orders from outside the territory from (a) distributors, or (b) others than distributors, for shipment into Carlock's territory, without informing Carlock and enabling Carlock to receive compensation therefor is not made clear. Other matters certain to arise in such a relationship are not delineated.

■■ These ambiguities and omissions leave Exhibit 1 an incomplete memorial of the entire agreement existing between the parties. When ambiguities of this nature exist so that the full and complete intention of the parties cannot be ascertained from an examination of the written contract, and where the entire contract consists of something in addition to that expressed in the writing, extrinsic evidence is admissible to resolve the ambiguities, supplement the writing and complete an entire agreement, as long as that evidence is not

contradictory of, repugnant to or inconsistent with the terms of the writing. Martindell v. Lake Shore National Bank, 15 Ill.2d 272, 154 N.E.2d 683 (1958); Greene v. Gust, 26 Ill.App.2d 2, 167 N.E.2d 438 (1960); American National Bank and Trust Co. v. Lembessis, 116 Ill.App.2d 5, 253 N.E.2d 126 (1969); Knorr v. White Bros. Trucking Co., 79 Ill.App.2d 471, 224 N.E.2d 299 (1967); Abingdon Bank & Trust Co. v. Bulkeley, 390 Ill. 582, 62 N.E.2d 447 (1945); Walgreen Co. v. American Nat. Bank & Trust Co. of Chicago, 4 Ill.App.3d 549, 281 N.E.2d 462 (1972); De Stefano v. Associated Fruit Co., 318 Ill. 345, 149 N.E. 284 (1925). Missouri law is in accord with Illinois law in this respect. See Beuc v. Morrissey, 463 S.W.2d 851 (Mo. banc 1971); Garden Park Homes Corp. v. Martin Marietta Corp., 507 S.W.2d 368 (Mo., decided April 8, 1974); Glass v. Mancuso, 444 S.W.2d 467 (Mo.1969); E. O. Dorsch Electric Co. v. Plaza Const. Co., 413 S.W.2d 167 (Mo.1967); Leggett v. Missouri State Life Ins. Co., 342 S.W.2d 833 (Mo. banc 1960). These authorities indicate that the practical construction which the parties themselves place upon an agreement is of considerable significance in ascertaining the meaning of the terms of an ambiguous contract. And "[w]here a person deals in a particular market he must be taken to deal according to the known general or uniform customs or usages of that market. * * * Where no particular stipulations are made to the contrary, contracts made in the ordinary course of business are presumed to be made with reference to any existing usage or custom relating to such trade, and it is always competent to resort to such usage or custom to ascertain and fix the terms of the contract." De Stefano v. Associated Fruit Co., supra, 149 N.E. l.c. 285.

### The Contract

Carlock offered and over repeated objections on the basis of the parol evidence rule the trial court properly admitted voluminous oral and documentary evidence designed to clear up these uncertainties and supply the omissions. From a consideration of Exhibit 1, as clarified and supplemented by extrinsic evidence of surrounding circumstances, the construction of the contract by the parties themselves, their course of dealing, the usages and customs of the trade and other evidence bearing on the meaning of the contractual arrangements between the parties, we conclude that the full and complete agreements, written and oral, reached by the contracting parties, were as follows:

(1) Carlock was to go to Chicago for one year as an employee of American at a salary of $15,000 and was not to become a regular distributor under the terms of Exhibit 1 until the expiration of that preliminary period of time.

(2) Pars. 16, 18 and 20 of Exhibit 1 were intended to take effect when Carlock became a regular distributor.

(3) The intention was to grant Carlock an exclusive franchise as a regular distributor in the three counties named in Exhibit 1, which exclusive territory was later enlarged to include Lake and Porter Counties in Indiana.

(4) The prices charged Carlock on catalog items were intended to be the published list prices, less discounts (in addition to the 2% discount for 10-day cash payment) on an item-by-item basis, ranging from 35% on some items to 60% on others.

(5) The prices charged to Carlock as a distributor were to be the same (no less than) those extended to all other distributors.

(6) Except on sales falling within one of the three exceptions mentioned in Par. 4 of Exhibit 1, American was obligated to direct to Carlock all inquiries received from prospective purchasers located within Carlock's exclusive territory, thereby enabling him to make the sale.

(7) Except on sales falling within one of the three exceptions mentioned in Par. 4

of Exhibit 1, upon receipt by American of orders from distributors located outside Carlock's territory for shipment to persons, firms or corporations located within Carlock's exclusive territory, American was obligated to protect Carlock by notifying him of such orders, to enable him to make satisfactory arrangements with the outside distributor for compensation.

(8) Except on sales falling within one of the three exceptions mentioned in Par. 4 of Exhibit 1, Carlock was entitled to compensation from American for sales not made through any distributor but made direct by American to persons, firms and corporations located outside Carlock's territory, where the products were shipped into and delivered within Carlock's territory as their ultimate destination.

(9) The sales excepted in Par. 4(b) were what is known in the trade as "OEM" sales, which are sales by American to original equipment manufacturers of items incorporated as an integral component part into the OEM's product for re-sale in such a manner that the item supplied by American loses its product identity, and such installation may be done either at the factory or in the field.

(10) Where engineering and consulting work is done by a distributor on jobs located outside his territory actually resulting in the specification of American products it is normal practice for him to notify the manufacturer, before the bidding takes place, and it is the duty of the manufacturer to alert the local representative who is to bid on the job, so that satisfactory arrangements can be made between the two manufacturer's representatives concerning the sharing of credits.

### Shipments Into Carlock's Territory

■ The trial court found that "on no occasion" did Modine or American sell its products within Carlock's territory in violation of the agreement or breach any contractual obligation owing to Carlock. Under our construction of the contract there is documentary evidence of numerous violations of the contract on account of shipments into Carlock's exclusive territory, and the trial court's contrary finding in this respect is clearly erroneous.

Since neither the word "sale" nor the words "sell within Distributor's territory" are defined in Par. 4 of Exhibit 1 we resort to the customs and usages of the trade to ascertain their true meaning. We learn from expert witness Sharp, whose testimony on this phase of the case we accept, that a shipment into a territory is definitely a sale into that territory in the absence of any specific language in the contract.

■ In this 3-volume transcript of 717 pages more than 280 invoices evidencing sales were in evidence. Carlock claims $13,-094.76 due on 97 shipments into his territory. The invoices and documents relating to these shipments, examined one by one, disclose 21 shipments into Carlock's exclusive territory made by American or Modine in violation of the contract (direct non-OEM sales of products destined for points located within Carlock's five counties; sales of which he was not advised and for which he received no credit).[1] There is testimony of record that on most sales during these years Carlock's discount was 38%, which would represent his gross profit. He is entitled only to net profits, Coonis v. Rogers, 429 S.W.2d 709, 714 (Mo.1968), and is restricted to 25% under his concession "that 25% of the sales price to the customer would represent profit for him"; that 25% profit was "usual." The total invoiced price of this group of 21 shipments into Carlock's territory was $25,301.27. At 25% the amount due Carlock on these shipments as of date of judgment amounts to $6,325.31. There is no liability on the other 76 exhibits, which either were OEM

---

1. These are the sales documented by Exhibits Nos. 170, 171, 185, 187, 188, 189, 190, 191, 192, 197, 198, 205, 206, 208, 210, 211, 214, 215, 216, 217 and 219.

sales excepted by Par. 4(b) of Exhibit 1, or involved shipments to points located outside Carlock's territory, or had no significant or established connection therewith.

There were also 9 shipments into Carlock's exclusive territory on orders received by American from distributors located in other parts of the country, which were non-OEM sales of products destined for points located within Carlock's exclusive territory, as to which he was not notified,[2] and of which Carlock became aware only by use of the discovery process in the course of litigation. According to the evidence the justification for participation by the local distributor in the commission to be allowed the selling distributor "is that the man into whose territory the equipment is shipped is, in most cases, responsible for the satisfactory performance of the equipment, and the service to the equipment." In failing to give Carlock notice and an opportunity to protect himself on these orders American violated its contractual obligations. Nothing more than nominal damages, however, can be assessed with respect to these shipments, for the reason that Carlock failed to sustain the burden of proving (1) that he would have been reasonably certain to reach an agreement with the other distributors for his financial participation in these transactions,[3] and (2) the percentage of the commissions he could reasonably have been expected to receive. Carlock made no showing of either. With respect to division of commissions he gave four instances in which he "split" his commission with another distributor, but introduced no evidence of the percentage retained and that shared.

### Sales Expectancy Bonus Discount Plan

■ On February 24, 1961, without prior notice or negotiation with those af-

fected, the home office of American announced to all sales outlets, including distributor Carlock, the institution of a sales expectancy bonus discount plan which effected a price increase by way of a reduction in discounts allowed distributors, from 42% to 38%. Under the plan annual sales expectancy figures were established, and bonus discounts were to be allowed on all purchases, in increasing percentages as annual sales increased in volume. The plan did not include OEM accounts or sales in which special quantity discounts were allowed. This plan constituted an offer which, upon acceptance, became a supplemental amendment of the previous contractual arrangements of the parties. Hinkeldey v. Cities Service Oil Co., Mo., 470 S. W.2d 494. Both parties operated under the plan. Carlock's acceptance is evidenced by the fact that with knowledge of the plan he continued in the capacity of distributor through several years. During that time, according to American's figures, Carlock's sales were large enough to earn a bonus discount only once, during the year 1962. He was sent a check for $57.60, which he cashed. Under the evidence we find the plan was in effect from inception through 1964, but was not in effect in 1965 and 1966. On remand the circuit court is directed to recalculate the sales to be credited to Carlock in each of the years the plan was in effect, in the light of the $25,301.27 of sales for which we have held he was entitled to credit, and determine what additional amounts, if any, are due Carlock under the sales expectancy bonus plan.

### Engineering and Consulting Work

■ Carlock claims damages for failure of American to compensate him for sales of American's products used in the construction of facilities at the Anheuser-Busch Brewery and at Armco Steel Corpo-

---

2. These are sales documented by Exhibits Nos. 34, 186, 193, 199, 200, 201, 204, 209 and 213.

3. In 32 cases in which *Carlock* procured orders for products shipped into the territories of

other distributors Carlock either failed to notify the distributor in the territory into which the shipment was made, failed to ascertain whether it was "open" territory, or failed to enter into a sharing arrangement.

ration plants in Houston, Texas, and at Griffin Wheel Plant in Bessemer, Alabama, on the basis that he was instrumental in effecting these sales. There is no convincing evidence that Carlock's efforts actually resulted in the specification of American's products or were the inducing cause of these sales. The evidence of Carlock's connection with each of these three transactions is casual and tenuous at best. It does not lend credence to the contention that he made a substantial contribution toward consummation of these sales, or that he timely notified American of his connection with them, as is expected of a manufacturer's representative if he is to share in the commissions. The trial court cannot be convicted of clear error in denying Carlock's claims on these items.

### Discounts Allowed to Others

Carlock complains that American promised to give him the best discounts allowed to *anybody* and points out that 49% discounts were allowed American Warming & Ventilating Company, of Toledo, Ohio, in the course of seven sales to that concern. Carlock says 49% was never his normal discount and therefore he was discriminated against. Par. 7 of Exhibit 1 allowed Carlock the same prices extended to all other *distributors*, but the Toledo firm was not a distributor. It was an independent manufacturer.

■ Carlock was not discriminated against on prices. As a matter of practice he was the only distributor who held the favored position of having been allowed an additional 5% discount on occasion. The court's finding against price discrimination is not clearly erroneous.

### Noncooperation in Developing Territory

■ Carlock complains that American and Modine prevented him from developing his territory into a lucrative operation by changing discounts in the middle of bidding, failing to quote prices when needed, quoting competitors, failing to protect his work with architects and engineers, failing to allow sufficient discounts to get the business, etc. The trial court found that on no occasion did American or Modine refuse to quote prices for its products, refuse to sell to Carlock, refuse to cooperate with Carlock in developing his territory, or otherwise violate its obligations under the contract in any of these respects.

The trial court's findings are not clearly erroneous, either because of failure of proof, insubstantial or speculative nature of evidence offered, contradictory evidence of record, situations in which the alleged loss of sales was conjectural at best, or unwarranted claims of lost profits because of refusal to give Carlock a sufficiently large extra discount (as to the allowance of which there was no contractual duty). In the instances in which the determination of the facts depended upon the credibility of the witnesses we defer to the superior opportunity of the trial court to ascertain the truth.

### On the Petition

■ Modine was awarded judgment on its petition as follows: $9,776.23 on the open account, and $3,288.07 interest thereon, less setoffs allowed in the sum of $365.36; credits in the sum of $48.98; interest on setoffs, $125.86, and interest on credits, $17.64. Carlock complains that he should have been allowed additional setoffs of $1,731.18, and that it was error to allow Modine any amount for interest under governing Illinois law. We find no merit in Carlock's claim for additional setoffs, except in two minor instances: a $2.21 item for which Carlock was not given credit, and a charge of $35.12 which was withdrawn from Modine's claim. Carlock's claims of setoffs of $1,602.15 on Exhibit 22 and $91.70 on Exhibit 24 are not substantiated to our satisfaction. The correct amount due Modine on the open account, therefore, after allowing all proper setoffs, is $9,324.56 ($9,776.23, less setoffs of $365.-36, $2.21 and $35.12, and credits of $48.98), plus interest.

On the question whether Modine should be allowed interest on the amount due on the open account: In Carlock's 71 assignments of error in his motion for new trial the only references to interest are complaints of the court's finding (1) that interest on the open account was due from the date of the invoices—that this was improper and that a proper calculation of interest would have been from 30 days *after the date of the invoices*; (2) *that no proper demand was made for interest*, and (3) that the court, while charging Carlock with interest on the open account, failed to award Carlock interest on the credits and setoffs allowed him. In the prayer Carlock asked the court to amend the judgment by allowing Carlock the same percentages of interest on the credits and setoffs as had been allowed Modine on the open account or, in the alternative, to delete all interest computations made in favor of Modine. Thus Carlock was complaining *that both parties should be treated the same on the matter of interest*; that both should be allowed interest or both denied interest. Responding to this complaint the trial court amended its conclusions of law, refigured the interest allowed Modine from 30 days after date of invoices, and made an allowance of interest to Carlock on his credits and setoffs. Now on this appeal Carlock raises the brand-new point, not presented to the trial court, that Modine was not entitled to recover interest in any amount, because under Illinois statute 74 § 2 S.H.A. and Alco Standard Corp. v. F. & B. Mfg. Co., 132 Ill.App.2d 24, 265 N.E.2d 507 (1970), and Weiland Tool & Mfg. Co. v. Whitney, 100 Ill.App.2d 116, 241 N.E.2d 533 (1968), interest is not allowable where the account is not liquidated; where there is an honest dispute as to the existence of the obligation, or as to the amount due; where the amount due is not readily ascertainable by simple computation, and one is conducting a reasonable defense to a claim.

Whether the point has been preserved for appellate review is a matter of procedure affecting the remedy and not the right, governed by the lex fori. Under Missouri law complaints as to the allowance of interest, not raised in the motion for new trial, are not reviewable on appeal. Flint v. Sebastian, 317 Mo. 1344, 300 S.W. 798, 806 [14] (1927). Carlock's present complaints were not raised in the motion for new trial and therefore have not been preserved for appellate review.

With respect to the judgment to be entered, there having been a counterclaim pleaded and partially established, only one judgment is required, which shall be rendered according to the facts. Brandtjen & Kluge v. Hunter, 235 Mo.App. 909, 145 S.W.2d 1009, 1014 [8] (1940). The judgment for Modine on its petition is affirmed, as modified, in the amount of $9,324.56, plus interest; the judgment on the counterclaim is reversed, and the cause is remanded with directions to ascertain whether Carlock is entitled to additional sums as and for bonuses. If so the court shall add that ascertained amount to the $6,325.31 above referred to, plus nominal damages of $1 on each of the 9 shipments, supra, plus interest. After subtracting the lesser amount from the greater the circuit court will render one final judgment for the difference between the two, in favor of the party in whose favor the greater amount was found. Interest shall be figured to, and all judgments entered as of, July 2, 1971. Costs of appeal, both on petition and counterclaim, assessed in favor of Carlock and against Modine.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court. All of the Judges concur.